IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: Summitt Logistics & Brokerage, LLC, | ) | Chapter 11 |
| Debtor. | ) | Case No. 09- |
| | ) | |
| In re: Summitt Trucking, LLC, | ) | Chapter 11 |
| Debtor. | ) | Case No. 09- |
| | ) | |
| In re: Tractor Leasing, LLC, | ) | Chapter 11 |
| Debtor. | ) | Case No. 09- |
| | ) | |
| In re: Trailer Leasing, LLC, | ) | Chapter 11 |
| Debtor. | ) | Case No. 09- |

| | |
|---|---|
| **FIRST DAY MOTION FOR DEBTOR-IN-POSSESSION FINANCING AND USE OF CASH COLLATERAL; REQUESTING PRELIMINARY AND FINAL HEARING** | Hearing: March 2, 2009  1:00 p.m. EST |
| | Location: U.S. Courthouse  121 W. Spring Street, Rm 103  New Albany, IN 47150 |
| | Telephonic Participation  Dial-In: 1-800-953-6502 |
| | Passcode: 8087910# |

     Summitt Logistics & Brokerage, LLC ("Logistics"), Summitt Trucking, LLC

("Trucking") Tractor Leasing, LLC ("Tractor  Leasing"), and Trailer Leasing, LLC ( "Trailer

Leasing" and together with Logistics, Trucking, and Tractor Leasing, the "Debtors" or the

"Companies") debtors and debtors-in-possession in the above-captioned cases, file this motion

(the "DIP Motion") respectfully requesting interim and final orders (the "Interim Order" and

the "Final Order") (a) authorizing the Debtors to obtain postpetition financing (the "DIP

Financing") provided by Transportation Alliance Bank, Inc. ("TAB") and Transportation

Alliance Leasing LLC ("TAL" and together with TAB, the "Lenders"); (b) authorizing the use of

cash collateral of the Lenders; and (c) scheduling interim and final hearings (the "Hearings")

pursuant to Bankruptcy Rules 4001(c) and 4001(d) and 6004(a)(2).  In support of this DIP

Motion, the Debtors rely on the Affidavit of David L. Summitt in Support of Petitions, First

Day Motions and Other Expedited Relief filed concurrently (the "Summitt Affidavit").

This is a "First Day" Motion as defined in S.D.Ind. B-9013-3 and provides notice

of certain relief requested pursuant to S.D.Ind. B-4001-2.

In further support of this DIP Motion, the Debtors represent as follows.

### A.  SUMMARY OF RELIEF REQUESTED

1.     The Debtors are seeking authority to secure post-petition financing and the

use of cash collateral to provide necessary support for maintenance of Debtors' operations and to

allow for Debtors to seek to reorganize.  The Debtors, a group of affiliated companies in the

short and long haul trucking business, have been attempting to reorganize their businesses for the

last 18 months through stream lining procedures, cost-cutting measures, business opportunity

analysis, and debt restructuring including new capital infusions.  However, the precipitous

economic downturn has caused Debtors to seek the protections of chapter 11 to continue with

their reorganization efforts.  The Debtors undertook a extensive search for postpetition financing,

however credit markets, especially for distressed companies are extremely tight and risk-

financing is scarce and demanding high premiums.  After arms-length discussions the Debtors

have successfully negotiated an agreement for postpetition financing with the Lenders, who are

two of the Debtors' prepetition lenders.  The debtor in possession financing agreement ("DIP

Agreement") is being offered by the Lenders on terms that include the roll-up or "cross-

collateralization" of certain pre-petition secured or equipment leasing obligations to the Lenders

-2-

with other post-petition loans and the granting of superpriority administrative status to the Lenders' claims subject to a "carve-out", and liens on substantially all the assets of the Debtors' estates, and servicing of other prepetition debt from cash generated under the proposed financing.  While these may be typically unfavored terms, these are difficult times with no lender willing or able to provide debtor-in-possession financing of the kind and amount necessary to sustain Debtors' operations.  The Debtors believe that the proposed DIP Agreement is in the best interests of the Debtors' estates and creditors and will allow the Debtors to attempt to restructure their businesses, serve their customers, and continue to provide jobs and healthcare to over 500 people in Southern Indiana.

### B.     SUMMARY OF PROPOSED DIP FINANCING TERMS (FRBP 4001, S.D.Ind. B-4001-2)

2.     The proposed post-petition financing ("DIP Financing") is being offered by the Lenders who hold prepetition obligations of the Debtors pursuant to three term notes, an accounts receivable factoring agreement, a fuel purchase credit line secured by a $150,000 letter of credit issued by TAB to secure the fuel line, and two master leases of both tractors and trailers.  These prepetition obligations are for the most part cross-collateralized, cross-guaranteed and secured by substantially all the assets and the proceeds of those assets of the Debtors.  These prepetition obligations are either in default or under contractual forbearance. Postpetition, the Lenders propose to extend a new account receivable factoring facility to the Debtors, an enhanced fuel line of credit, and a limited letter of credit facility. A condition of extending this postpetition financing is the "roll-up" of one of the term notes and the two master leases in the postpetition financing loan facility with all being secured by substantially all the assets of the Debtors (other than Chapter 5 Bankruptcy avoidance and actions subject to existing Permitted

Liens[1] and a certain "Carve Out" for professional fees of the Debtors and Creditors' Committee) and afforded superpriority administrative expense status. A further condition of the financing is the servicing of the two non-included term notes and a prepetition accounts receivable financing facility from cash generated postpetition under the DIP Financing (the "Serviced Loans"). Payments on the Serviced Loans will not be afforded superpriority administrative expense status. The Lenders have agreed to restore the non-default rates of interest on all the term notes and the existing letter of credit upon entry of a final order approving the DIP Financing. The proposed DIP Financing includes a $150,000 "carve-out" for professional fees and expenses of the Debtors' and any official committee. The proposed DIP Financing has a maturity date of March 31, 2010 (subject to earlier termination following an event of default) and can be extended for an additional six months. The proposed DIP Financing is summarized more completely as follows:

   3. The DIP Agreement is by and between Logistics, Trucking, Trailer Leasing and Tractor Leasing as borrowers ("Borrowers"), David Summitt, Jenny Summitt, Big T Transfer, Inc., Ideal Paint & Body, Inc. and Silver Creek LLC as guarantors ("Guarantors") and the Lenders. A copy of the DIP Agreement without Exhibits[2] is attached as Attachment "A" to this motion. The DIP Agreement provides for postpetition financing pursuant to:

   a. the Accounts Receivable Purchase and Security Agreement ("TAB A/R Agreement"), a copy of which is attached as Exhibit "G" to the DIP Agreement and as Attachment "B" to this DIP Motion. Under the TAB A/R Agreement, the Lenders will purchase

---

[1] Permitted Liens are defined in the DIP Agreement and refer primarily to the liens of equipment financers of the Debtors who hold liens on titled rolling stock and are listed on an Exhibit to the DIP Agreement and attached hereto as Attachment "D".

[2] The Exhibits to the DIP Agreement are over 5,000 pages and are available from the Debtors upon request. The Debtors will also make the Exhibits available on a website accessible to parties in interest and will file a notice of the web address.

the Debtors' accounts receivable, subject to a reserve and transaction fees, providing cash availability to the Debtors on invoices for postpetition services;

b.      the Fuel Line Agreement ("Fuel Line Agreement"), a copy of which is attached as Exhibit "H" to the DIP Agreement and as <u>Attachment "C"</u> to this DIP Motion which will provide $250,000 ($290,000 for an early limited time) in a revolving credit line at 8% per annum interest for fuel purchases ;

c.      a letter of credit collateralized with 105% cash deposit (the "Existing Letter of Credit") and the ability to cause other letters of credit to be issued up to $150,000;

d.      two Master Lease Agreements and schedules thereto for the leasing of trailers and tractors (collectively the "Leases"),  attached as Exhibits "E" and "F" to the DIP Agreement; and

e.      a term note financing much of the Debtors' trailer rolling stock ("Textron[3] Term Note" and together with the Leases, the Existing Letter of Credit, the Fuel Line, and the TAB A/R Agreement, the "DIP Loans"), attached as Exhibit "C" to the DIP Financing Agreement.  The DIP Loans will be granted superpriority administrative expense status (subject to the "Administrative Carve-Out" as described below) pursuant to 11 U.S.C. § 364(c)(1).

4.      Two prepetition notes secured by real estate owned by the Non-Debtor Guarantors ("Real Estate Secured Loans") and the Textron A/R Facility (referred to collectively as the "Serviced Loans" above) are not collateralized with post-petition assets of the Debtors, however the DIP Agreement requires paying the Real Estate Secured Loans and the Textron A/R Facility (only to the extent of any deficiency as the Textron A/R Facility will be allowed to run

---

[3] The Lenders purchased the Textron Term Note as well as a prepetition accounts receivable financing facility ("Textron A/R Facility") from Textron Financial Corp. ("Textron") prior to the filing of these chapter 11 cases.

off through the collection of payments on the financed receivables) with cash generated postpetition under the DIP Agreement.  The accrual for payments on the DIP Loans and the Serviced Loans will be deducted from the purchase price paid by Lenders under the TAB A/R Agreement for all the Debtors' accounts receivable prior to making the remainder available in cash to wire to the Debtors' operating disbursement account.

5.    Following the entry of a final order approving the DIP Financing, the interest rates of the Textron Term Note, the Leases and the Real Estate Secured Loans will be reset to the non-default rates.

### DISCLOSURE OF FINANCING TERMS PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2

6.    Pursuant to Federal Bankruptcy Rule ("FBR _ " ) 4001 and Local Rule 4001-2 of the Bankruptcy Court for the Southern District of Indiana ("S.D.Ind. B-__"), the Debtors make the following disclosures as to terms and conditions contained in the DIP Agreement:

a.    The proposal includes the "cross-collateralization" of certain prepetition debt of the Lenders with liens granted against other pre-petition and postpetition assets and granting to such prepetition debt super-priority administration status.  This includes the Textron Term Note, the Leases, and the Existing Letter of Credit.  *See* Section 4 of the DIP Agreement. Avoidance actions are not part of the Lenders' collateral.  *See* Section 4.1 of the DIP Agreement.

b.    The Debtors and their estates will waive and release all claims they may have contesting the validity, perfection, or amounts of the Lenders' claims.  *See* Section 11.27 of the DIP Agreement.  However, any committee or party in interest may challenge the Lenders claims or liens provided that the challenge is brought within 60 days of the appointment of an official committee of unsecured creditors (the "Committee").

-6-

c.    The proposal waives the Debtors' estates' rights to surcharge under 11 U.S.C. § 506(c) or to any claims under 11 U.S.C. § 553(b).  *See* Section 11.26 of the DIP Agreement.

d.    The proposal includes a "carve-out" provision of $150,000 for the payment of the debtors and the Committee's professionals upon the occurrence of an Event of Default.[4]  *See* Section 5.1 of the DIP Agreement ("Administrative Expense Carve-Out").

e.    The proposal grants the Lenders relief from the automatic stay to realize on the collateral and/or setoff upon an Event of Default (following three business days' notice to the Debtors, the Committee, and the United States Trustee and applicable cure period, if any) without further order or hearing.  *See* Section  9.2 of the DIP Agreement.

f.    The DIP Agreement includes the Debtors' indemnification of the Lenders for claims arising out of the DIP Agreement, the transactions contemplated therein or the use of proceeds.  *See* Section 11.4 of the DIP Agreement.

g.    The DIP Agreement does not provide for the priming of any valid pre-petition lien against any of the Debtors' assets, but does grant liens in the Collateral (as defined in the DIP Agreement) subject to the Permitted Liens.  A copy of the schedule of Permitted Liens is attached as Attachment "D".

h.    The DIP Agreement prohibits the changing of any loans to the Debtors or the obligations thereunder pursuant to any chapter 11 plan without the Lenders' consent.

i.    A copy of the proposed interim order granting this DIP Motion is attached as Attachment "E".

---

[4] Capitalized terms not defined herein have the meanings ascribed in the DIP Agreement.  *See* Section 5 – Definitions.

## JURISDICTION AND VENUE

7.       On March 2, 2009 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under Chapter 11 of Title 11 of the U.S. Code (as amended, the "Bankruptcy Code") commencing these Chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting the Chapter 11 Cases be jointly administered for procedural purposes only.

8.       No trustee or examiner has been appointed and no committee has yet been appointed or designated.

9.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

10.       The statutory predicates for the relief requested herein are sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 507 of the Bankruptcy Code and Rules 4001(c), 4001(d) and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" or "FBRP_") and S.D.Ind. B-4002-1 .

## COMPANY BACKGROUND AND EVENTS LEADING TO FILING

11.       The Debtors are a group of affiliated Indiana limited liability companies primarily engaged in short and long haul over the road shipping and warehousing businesses with headquarters located in Clarksville, Indiana ("Headquarters").  The Debtors employ nearly 400 employees.  Logistics provides brokerage services to Trucking, as well as warehousing and brokerage services to other customers.  Trucking transports the loads brokered by Logistics and

-8-

leases its fleet from Tractor Leasing and Trailer Leasing. Summitt Holdings, LLC ("Holdings") is the sole member of the Debtors and prepares a consolidated tax return of the Debtors. The Debtors are disregarded entities for tax purposes. Holdings membership interests are held by Stock Investments, LLC (33.3%), David Summitt (33.4%), and Jenny Summitt (33.3%). Stock Investments, LLC is an Indiana limited liability company owned by Jesse Ballew and Stanley A. Richards. David and Jenny are husband and wife. David and Jenny are the managers of each Holdings, Logistics, Trucking, Tractor Leasing, and Trailer Leasing.

12.    The Debtors' cash is generated by the factoring of its accounts receivable, thus allowing the Debtors immediate cash on billed invoices (and in some cases unbilled invoices) instead of receiving cash as invoices are paid some 30 to 60 days later.

13.    The Debtors own no real estate and lease the Headquarters from Silver Creek, LLC.

14.    A more detailed explanation of the background and businesses of the Debtors and the events leading to these Chapter 11 Cases is set forth in the Summit Affidavit.

## PREPETITION FINANCING

15.    Prior to the Petition Date, the Lenders purchased the Textron A/R Facility and the Textron Term Note (collectively the "Textron Loans") from Textron. The Textron A/R Facility provided cash to the Debtors for both billed and unbilled invoices and the Textron Term Note financed the purchase of certain trailers. The Textron A/R Facility and the Textron Term Note were further collateralized with certain real estate owned by David or Silver Creek, LLC, an entity controlled by David and Jenny. Each of the Debtors, David, and Jenny and other non-debtor guarantors guaranteed the Debtors' obligations to Textron and the two debt obligations were subject to a cross-collateralization security agreement.

16.     The Lenders were already prepetition creditors of the Debtors when they purchased the Textron loans.[5] TAB holds two prepetition notes of Trucking in the original principal sums of $1,080,824.80 and $904,500.00 secured by mortgages on property not owned by the Debtors (collectively, the "Real Estate Secured Loans").  The properties are variously owned by non-debtor parties, Silver Creek, LLC, David and Jenny.  TAL was a party to two master lease agreements, one with Tractor Leasing and one with Trailer Leasing (previously identified as the "Leases") pursuant to which Tractor Leasing and Trailer Leasing leased tractors and trailers from TAL.   TAB also issued a letter of credit (previously identified as the "Existing Letter of Credit") for the Debtors in favor of TCH, an affiliate of Flying J, Inc., one of the Debtors' fuel suppliers.  The Debtors purchased some of their fuel under a fuel-credit cards platform from TCH.  The Textron A/R Facility, the Textron Term Note, the Real Estate Loans, and the Leases may be collectively referred to as the "Existing Credit Facilities."

17.     Trailer Leasing and Tractor Leasing are also parties to certain lease financing agreements with equipment providers who hold first priority perfected liens in the tractors and trailers being purchased under those agreements.  The liens of these equipment providers are "Permitted Liens" under the DIP Agreement.

18.     David, SilverCreek LLC, Jenny and certain other non-debtor parties have loaned monies to the Debtors pursuant to certain promissory notes and loans.

## RELIEF REQUESTED

19.     By this DIP Motion, the Debtors seek, among other things, this Court's authorization under Sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 507 of

---

[5] The purchase of the Textron loans applicable to the Companies was part of a larger acquisition of a portfolio of loans from Textron by the Lenders.  Textron who had been active in the provision of debtor-in-possession financing and the factoring of receivables appears to have terminated that part of its business.

the Bankruptcy Code to enter into the DIP Agreement and the documents thereunder with the Lenders to obtain debtor-in-possession financing and authorization to use cash collateral of the Lenders pursuant to the budget attached as Attachment "F" to this DIP Motion, under an Interim Order pending the Final Hearing; and request that the Court, pursuant to Bankruptcy Rule 4001, schedule the Final Hearing and establish notice procedures in respect of the Final Hearing.

## BASIS FOR RELIEF

20.     The Debtors are aware that the terms and conditions of the DIP Financing as proposed include relief that may not be granted on an interim basis absent extraordinary circumstances pursuant to S.D.Ind. B-4001-2.  The Debtors believe such extraordinary circumstances exist.  All of the Debtors' cash is generated from the sale of its accounts receivable as invoices are created and in some instances as soon as the load is transported for the customer. The Debtors have been financing their operations in this manner for over a year and if such financing were to stop, the Debtors would have no cash available for operating expenses or meeting payroll until invoices were paid in the ordinary course some 30 to 60 days after generation.  Prior to the filing of these cases, the Debtors restructured their businesses to eliminate unnecessary costs, increased their freight charges, reworked unprofitable routes and services, reduced the number of employees, terminated the employer 401(k) match, and extensively sought credit to assist them in turning the businesses towards a profitable bottom line.  David Summitt, the CEO of the companies sought additional lines of credit from existing lenders and also from potential lenders who were recommended by his customers and others. The Debtors employed financial advisors and an investment banker to explore the sale of the Debtors' businesses from June 2008 through December 2008), however no offers materialized

either to purchase or finance a restructuring.  As it became more clear that a chapter 11 filing

was necessary, David and the financial advisors and investment banker sought interest from

potential lenders to provide debtor-in-possession financing. The Debtors and the Lenders began

discussions about three weeks prior to this filing concerning debtor-in-possession financing and

have worked diligently since then to craft a proposal that would provide operating capital to

restructure the businesses and fairly compensate the Lenders for the risk they would be

undertaking especially in these severe economic times.  The Debtors did receive one other

proposal for a debtor-in-possession accounts receivable financing facility, however the proposal

was capped at an amount not sufficient to provide operating capital to run the businesses, did not

provide for financing of shipped but not yet billed loads, and did not include a fuel credit line, a

necessity for these trucking businesses.  Moreover, if Debtors attempted to use this other possible

DIP financing source, the pre-petition secured loans and leases owing to lenders would remain in

default and Debtors would have to provide for adequate protection to such Lenders as a

condition for use of the assets against which Lenders hold prepetition liens or to use leased

equipment.

21.    The proposed DIP Financing includes a provision to cross collateralize

certain prepetition debt and lease obligations of the Debtors with all the Debtors postpetition

property.  Cross collateralization is an unfavored form of chapter 11 financing, but it has been

approved by courts where the debtor can demonstrate (a) that its business operations would fail

absent the proposed financing, (b) that it is unable to obtain alternative financing on acceptable

terms, (c) that the proposed lender will not accept less preferential terms, and (d) that the

proposed financing is in the general creditor body's best interest.  *In re Vanguard Diversified,*

*Inc.*, 31 B.R. 364, 366 (Bankr. S.D.N.Y. 1986) *referencing In re Roblin Indus., Inc.,* 52 B.R. 241, 244-45 (Bankr. W.D.N.Y. 1985).

22.     While some circuit courts of appeal have determined that cross-collateralization is not permitted under the Bankruptcy Code (*see Shapiro v. Saybrook Manufacturing Co., Inc.,* 963 F.2d 1490, 1494-5 (11th Cir. 1992), the Seventh Circuit Court of Appeals has not yet ruled on this issue.  However, its decision in *Kmart* (*In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004) would seem to indicate that a Bankruptcy Court has equitable powers under Section 105 to grant cross-collateralization (or other equitable relief) in circumstances where the debtor can prove that "but for" the grant of the relief the debtor would cease its business and that the benefits to the creditors who may be affected by such extraordinary relief outweighs the harm or at least leaves them no worse off.  In the Debtors' circumstances, both parts of the *Kmart* test can be met, as can the tests set forth in *Vanguard* above.

23.     Absent the proposed financing being offered under the DIP Agreement, the Debtors would have no choice other than to cease operations and lay off their nearly 400 employees.  As stated above, the Debtors generate cash through the financing of their accounts receivable.  This immediacy of cash availability upon invoicing their customers allows the Debtors to operate their businesses and pay their employees.  There is no circumstance under which the Debtors businesses could survive if they were to attempt to move to collection of their own accounts receivable in a 30 to 60 day time frame as they would be out of cash within a few days.

24.     The Debtors undertook extensive efforts for over six months to find financing on equivalent or more favorable terms than under the DIP Agreement, including seeking relief from all their current lenders and employing financial advisors and an investment

-13-

banking firm to assist them in locating either new lenders or a potential sale of the businesses. The Lenders were one of only two parties who responded.  However, the other potential lender offered a facility that was not sufficient to fund the Debtors' operations.

25.    The Debtors have determined that the Lenders'  DIP Agreement is, under the circumstances, the most favorable and best addressed the Debtors' postpetition financing needs.  Accordingly, in their sound business judgment, the Debtors have decided to accept the Lenders' proposal.

26.    The Debtors and the Lenders negotiated extensively over a period of time and the provisions in the DIP Agreement are conditions without which the Lenders will not undertake the risk of financing the Debtors during the Chapter 11 Cases.

27.    With the purchase by the Lenders of the Textron Loans, the Lenders rights in and to substantially all the assets and the proceeds of the assets of the Debtors under the Lenders' prepetition loans and the Textron Loans was comprehensive and had a first priority. The proposed DIP Agreement, while including cross-collateralization of some, but not all, of the prepetition debt with post-petition assets does not in practical fact alter the security held by the Lenders.  The only new post-petition asset in which a security interest is being granted that could secure prepetition debt are the receivables being financed under the TAB A/R Facility and for which the Lenders are advancing credit and providing cash flow that otherwise would not be available to the Debtors for use postpetition.  No prepetition creditor would have a right to the cash from the financings and the cash will allow the Debtors to continue to operate their businesses and it is hoped effect a restructuring that will provide payments to unsecured claims.

28.    The DIP Agreement is not out-of-line with current debtor-in-possession financings in these difficult economic times.  As credit has contracted, even in the non-

-14-

insolvency world, the number of lenders in the insolvency world has decreased and the terms of any such lending have become more demanding.  Recent cases in which debtor-in-possession lending that included cross-collateralization, roll-up of prepetition debt into postpetition financing or other "extraordinary relief" include the bankruptcy cases of Linens Holding Co., Case No. 08-10832 (Bankr. D. Del.) (CSS) (roll-up of prepetition facility), Circuit City Stores, Inc., Case NO. 08-35653 (Bankr. E.D.Va. Nov. 10, 2008) (KRH) (roll up of prepetition debt and priming liens on all property), Pilgrim's Pride Corporation, Case No. 08-45664 (Bankr. N.D.Tex. Dec. 30, 2008) (DML) (prepetition and postpetition loans borrowing base and priming lien on all postpetition property), and Lyondell Chemical Co., Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (REG) (priming lien on all assets).

29.     The Debtors have determined that the DIP Financing Agreement is necessary for the Debtors to operate their businesses in chapter 11 and for the Debtors' successful reorganization.  Because the Debtors' existing cash on hand will not be sufficient to fund their restructuring process, the Debtors have concluded that the DIP Financing Agreement is necessary and in the best interest of these estates.

30.     The Debtors believe that the cash that will provided under the DIP Agreement will allow Debtors to have sufficient liquidity to continue necessary operations during reorganization.

31.     The DIP Agreement and the documents to be executed in connection therewith, are the result of arm's length negotiations between the Debtors and the Lenders.

32.     If a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, then the Court, after notice and hearing, may authorize the debtor to obtain credit or incur debt:

-15-

a.    with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; or

b.    secured by a lien on property of the estate that is not otherwise subject to a lien; or

c.    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

33.    In addition, this Court may authorize the Debtors to enter into the DIP Agreement pursuant to Section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code grants broad Lenders to a court to enforce the provisions of the Bankruptcy Code under equitable common law doctrines.  This section provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, <u>sua sponte,</u> taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

34.    The Debtors have been unable to procure the required funds in the form of unsecured credit or unsecured debt with an administrative priority because of the risk factors and amount of funds required by the Debtors to operate in the ordinary course of their business. Accordingly, the circumstances of these Chapter 11 Cases require the Debtors to obtain financing under Section 364(c) of the Bankruptcy Code.

35.    Having determined that financing is available only under Section 364(c) of the Bankruptcy Code, the Debtors negotiated the DIP Agreement at arm's length and pursuant to their business judgment.  Provided that this judgment does not run afoul of the provisions of

-16-

and policies underlying the Bankruptcy Code, courts routinely grant a debtor considerable deference in acting in accordance with its business judgment. See, e.g., Brav v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); In re Ames Department Stores, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under Section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

36.     The DIP Agreement is for the benefit of the Debtors' estates and creditors. Such financing is critical to the preservation and enhancement of the Debtors' going concern value. With the credit provided by the DIP Financing Agreement, the Debtors will be able to pay their employees and maintain adequate cash balances customary and necessary for companies of this size in this industry to operate their businesses in order to preserve the ongoing value of their businesses for the benefit of all parties in interest.

37.     The DIP Agreement will also likely be viewed favorably by the Debtors' employees and customers and promote the Debtors' successful reorganization. Indeed, without the financing provided for in the DIP Agreement, the Debtors may not be able to meet payrolls and other direct operating expenses during the pendency of these Chapter 11 Cases, which in turn could cause irreparable harm and jeopardize the Debtors' reorganization efforts. Accordingly, this Court should authorize the Debtors to obtain the DIP Agreement to the extent and pursuant to the terms contained herein, in the DIP Agreement and in the proposed Interim Order.

38.    The terms and conditions of the proposed DIP Agreement are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  Accordingly, the Lenders should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of the DIP Agreement.  The Lenders should also be provided with the protection of Bankruptcy Code § 363(m).

**Interim Approval of the
DIP Financing Agreement Should be Granted**

39.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to Section 364 may not be commenced earlier than 15 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing (an "Interim Hearing") on the DIP Motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable to the Debtors' estate.

40.    The Debtors request that the Court conduct an Interim Hearing on the DIP Motion and authorize the Debtors from and after the entry of the Interim Order until the Final Hearing to obtain credit under the DIP Agreement pursuant to the Budget.  This will enable the Debtors to access cash, maintain ongoing operations, and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

**NOTICE WITH RESPECT TO THE INTERIM AND FINAL HEARINGS**

41.    The Debtors respectfully request that they be authorized to provide notice of the interim hearing by Expedited Service Option A upon: (i) the Office of the United States Trustee; (ii) the Debtors' thirty largest creditors on a consolidated basis;  (iii) counsel for the Lenders, (iv) the Internal Revenue Service; and (v) all parties who have filed requests for notice under Bankruptcy Rule 2002.  The Debtors request that the Court consider such notice of the

BDDB01 5551951v4

Interim Hearing to be sufficient notice under Bankruptcy Rules 4001(c) and (d) and 6004(a)(2).

Debtors request notice of the Final Hearing be included in the Interim Order, to include a finding

that such notice shall be sufficient notice under Bankruptcy Rules 4001(c) and (d) and

6004(a)(2).

## NO PRIOR REQUEST

42.    No previous request for the relief sought herein has been made to this

Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order (i)

granting the relief requested herein and (ii) granting such other relief as is just and proper.

Respectfully Submitted,

BAKER & DANIELS LLP

By: /s/ Terry E. Hall_____

James M. Carr (#3128-49)            Attorneys for the Debtors and Debtors-in-Possession
Terry E. Hall (#22041-49)
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
jim.carr@bakerd.com
terry.hall@bakerd.com

BDDB01 5551951v4