**SO ORDERED: March 02, 2009.**

**Basil H. Lorch III**
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE | : | |
| | : | Chapter 11 |
| SUMMITT LOGISTICS & BROKERAGE, LLC, et al., | : | |
| | : | Case No. 09-90630-BHL-11 |
| | : | |
| Debtors and Debtors-in-Possession. | : | (Joint Administration Requested) |

**INTERIM FINANCING ORDER (1) APPROVING DEBTOR-IN-POSSESSION FINANCING, (2) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE, (3) MODIFYING THE AUTOMATIC STAY AND (4) GIVING NOTICE OF SCHEDULED FINAL HEARING**

This matter came on for hearing on March 2, 2009, at 1:00 o'clock, p.m. EST (the "***Interim Hearing***").  Summitt Logistics & Brokerage, LLC ("Logistics"), Summit Trucking, LLC ("Trucking") Tractor Leasing, LLC ("Tractor Leasing"), and Trailer Leasing, LLC (collectively, the "Companies")[1] and each a "Debtor" and collectively "Debtors" in the above referenced Chapter 11 cases (the "Chapter 11 Cases"), filed voluntary petitions to commence cases under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), on March 2, 2009 (the "Petition Date").  The Debtors have applied to this Court (the "Motion") for (1) approval of Debtors' post-petition entry into that certain "Post-Petition Credit Agreement (with Guaranties) dated as of March 2, 2009, among Summitt Trucking LLC, Summitt Logistics & Brokerage, LLC, and Trailer Leasing, LLC, Borrowers, as Debtors and Debtors-in-Possession, the Debtor Guarantors and the Non-Debtor Guarantors from Time to Time, Parties Hereto, and Transportation Alliance Bank Inc. ("TAB") and Transportation Alliance Leasing LLC ("TAL") as Lenders" (the "DIP Agreement"),[2] (2) authorization pursuant to Bankruptcy Code § 364(c) and (d) in the capacity of either borrower or guarantor, to obtain debtor-in-possession financing from the Lenders (as hereinafter defined) pursuant to the terms and conditions of:  (a) the DIP Agreement, substantially in the form of that annexed as an exhibit to the Motion (with all ancillary Loan Documents referred to therein and as required to be executed in connection therewith) by and among the Debtors and the Lenders, (b) the Budget, a copy of which is

---

[1]   Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the DIP Agreement.

[2]   TAB and TAL are collectively referred to as the "Lenders" when collective reference is made.

2

annexed as Exhibit "A" hereto, which may be amended, supplemented, extended or otherwise modified as set forth in the DIP Agreement, and (c) this Interim Order (the "Interim Order" and with the DIP Agreement and the Budget, collectively the "DIP Credit"), and (3) authorization to grant super-priority administrative claim treatment to the Lenders for any use of cash collateral, certain post-petition advances, subject to the liens, security interests and super priority treatment granted to the Lenders.

A final hearing (the "Final Hearing") concerning the request for entry of a final order (the "Final Order") with respect to the Debtors' Motion is scheduled for April 20, 2009, at 2:00 p.m. EDT before the Court in New Albany, Indiana, or as soon thereafter as counsel may be heard.

Upon the record of the Chapter 11 Cases and the record of the Interim Hearing, good and sufficient cause appearing therefore, and it appearing to be in the best interests of the Debtors' estates and creditors:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

(a)    On the Petition Date, each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Indiana, New Albany Division (the "Bankruptcy Court").  Each Debtor is continuing in the management and possession of its business and properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(b)    Consideration of this Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M), and (O).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

BDDB01 5590494v4
877432.2

(c)    Sufficient and adequate notice of this Interim Order has been provided based upon the notice sent to the Interim Noticed Parties (as hereinafter defined), and the consent to the Motion as approved by this Interim Order by the Lenders pursuant to Bankruptcy Rules 4001(b), (c) and (d), and 9014, and Section 102(1) of the Bankruptcy Code as required by Sections 364(c) and 364(d) of the Bankruptcy Code, and no further notice of, or hearing with respect to this Interim Hearing and the relief requested in the Motion, is necessary or required.

(d)    The Lenders are willing to advance money and provide certain other credit facilities to the Debtors and the Debtors and Lenders are willing to consent to the treatment of the Lenders and the use of cash collateral on an interim basis only upon the conditions contained in this Interim Order.

(e)    The Debtors are unable to obtain sufficient levels of unsecured credit, leasing lines, fuel provisioning credit lines, factoring lines, and related necessary financial facilities to maintain and conduct their businesses allowable only under Bankruptcy Code §§ 364(b) and 503(b)(1) as an administrative expense.

(f)    The Debtors are unable to obtain secured credit allowable only under Bankruptcy Code §§ 364(c)(2), (c)(3) and (d), except under the terms and conditions provided in this Interim Order.

(g)    The credit and financial accommodations to be extended under the DIP Agreement are being extended by the Lenders in good faith and (i) the provisions for extension of adequate protection and use of cash collateral are made in good faith, and (ii) the Lenders as defined herein are entitled to protection of Bankruptcy Code § 364(e).

(h)    It is in the best interest of the Debtors' estates that they be allowed to finance their operations under the terms and conditions as set forth herein.

(i)      Notice of the relief sought by the Motion, and the Interim Hearing with respect thereto, which has been held pursuant to Bankruptcy Rule 4001(c) and Bankruptcy Code § 102(1), as required by Bankruptcy Code § 364(c) and (d), has been given to the following parties in interest:  the Office of the United States Trustee (the "U.S. Trustee"); the Lenders, the Internal Revenue Service, and the creditors holding the 20 largest unsecured claims on a consolidated basis against the Debtors' estates ("Interim Notice Parties").

(j)      Without prejudice to the rights of any party (but subject to the limitations with respect to such rights contained in paragraph 10 of this Interim Order below), the Debtors admit that as of the Petition Date that they are liable pre-petition under the following described credit facilities (the "Existing Credit Facilities") and, that as to each:  (1) the Debtors were indebted without claim, defense, counterclaim, recoupment or offset of any kind, and that the amount of the aggregate principal plus interest costs, expenses and other charges thereon, including, without limitation, all attorneys' fees and legal expenses of the Lenders, is accurately stated; and (2) the credits were fully secured by valid, binding, enforceable and properly perfected first-priority liens and security interests in all of the collateral as defined in the documents supporting each credit facility as specified and described as the Loan Documents in the DIP Agreement, existing as of the time immediately prior to the filing of the petitions for relief herein and the post-petition proceeds and products thereof.  The Existing Credit Facilities are:

(1)      that certain Promissory Note, with TAB as the lender, dated September 30, 2005, in the original principal sum of $1,080,824.87, together with ancillary mortgages (Exhibit "A" to the DIP Agreement);

(2)      that certain Promissory Note, with TAB as the lender, dated September 30, 2005, in the original principal sum of $904,500.00, together with ancillary mortgages

5

(Exhibit "B" to the DIP Agreement) (the Promissory Notes referenced in sub-subparagraphs (1) and (2) of this subparagraph (j) are hereafter referred to as the "*Real Estate Secured Loans*");

(3)     that certain Term Promissory Note, dated July 3, 2007, in the original principal sum of $3,900,000, together with ancillary mortgages and personal property security agreements and lien perfected titles to such equipment, originally with Textron Financial Corporation ("Textron") as lender, which facility was purchased by and assigned to TAB pre-petition (the "Textron Term Note") (Exhibit "C" to the DIP Agreement);

(4)     that certain Textron Corporation Factoring Agreement dated July 3, 2007, as amended on February 27, 2008, with ancillary mortgages, guarantees, security and perfection documents, originally with Textron as Purchaser/Lender, which facility was purchased by and assigned to TAB pre-petition (the "Textron A/R Facility") (Exhibit "D" to the DIP Agreement);

(5)     that certain Master Lease Agreement, dated June 18, 2004, by and between TAL, as lessor, and Trailer Leasing, LLC, as lessee, together with Schedules thereto (Exhibit "E" to the DIP Agreement);

(6)     that certain Master Lease Agreement, dated August 4, 2004, by and between TAL, as lessor, and Tractor Leasing, LLC, as lessee, together with all Schedules thereto (Exhibit "F" to the DIP Agreement) (the Leases referred to in sub-subparagraphs (5), and (6), of this subparagraph (j) are collectively referred to as the "*Leases*"); and

(7)     the Existing Letter of Credit (as defined below and in the DIP Agreement);

All of these facilities, and each of them, predate Borrowers' Chapter 11 Cases, and are each variously guaranteed by Guarantors and variously cross-guaranteed by Borrowers among one another and which are cross-collaterized.

6

(k)     Specifically, the Textron A/R Facility, in addition to other collateral and pursuant to certain collateralized guarantees of such facility given by David Summitt, Jenny Summitt, Silver Creek, LLC and Trailer Leasing, LLC, is secured by mortgages on the following real property owned variously by Silver Creek, LLC, and David and Jenny Summitt, described as follows:

(1)     1021 Progress Way, Sellersberg, Indiana;

(2)     5001 and 5005 Charlestown Road, New Albany, Indiana;

(3)     5007 Charlestown Road, New Albany, Indiana (first partial); 3050 Ashley Court, New Albany, Indiana; and 3205 Magnolia Court, New Albany, Indiana;

(4)     7615 Highway 31 E., Sellersberg, Indiana; and,

(5)     5007 Charlestown Road (second partial), New Albany, Indiana.

(collectively the *"Textron Real Estate Collateral"*). The mortgages executed and delivered to Textron are, as of the Petition Date, first position liens on each of the above-described parcels of real property either because of the absence of superior liens or the result of subordination agreements given by superior lien holders.

(l)     The Textron Term Note, pursuant to certain mortgages and collateralized guarantees given prepetition by David and Jenny Summitt, is directly secured by a mortgage (in addition to equipment and other collateral and any cross-collaterization of other collateral) recorded as a first position lien on the following real property owned by David and Jenny Summitt:

(1)     Lot 5, Riverside Subdivision, Manatee County, Florida (the *"Florida Property"*).

BDDB01 5590494v4
877432.2

(m)     The Real Estate Secured Loans, as a result of certain collateralized guarantees given to TAB prepetition by David and Jenny Summitt and Silver Creek, LLC, in addition to other collateral, are secured by mortgages on certain real property owned variously by David and Jenny Summitt and Silver Creek, LLC, described as follows:

(1)     3330 Campground Road, Louisville, Kentucky,  40211; and,

(2)     1800 Progress Way, Clarksville, Indiana, 47129.

(collectively the *"TAB Real Estate Collateral"*).   The mortgages executed and delivered to TAB are first position liens on each such parcel of real property either because of the absence of superior liens or as the result of subordination agreements given by superior lien holders.

(n)     Without prejudice to the rights of any party (but subject to the limitations with respect to the rights contained in paragraph 10 of this Interim Order below), the Debtors admit that no portion of the Existing Credit Facilities is subject to avoidance, recharacterization, recovery, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors do not have, and hereby forever release any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or applicable non-bankruptcy law on or prior to the date hereof, against the Lenders, their predecessors or successors, and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys, and advisors.

(o)     The Debtors represent that without the financing proposed by the Motion, the Debtors will not have the funds necessary to pay post-petition payroll, payroll taxes, trade vendors, suppliers, overhead and other expenses necessary for the continued operation of the Debtors' businesses and management and preservation of the Debtors' assets and properties. The Debtors have requested that pursuant to the DIP Agreement and this Interim Order, the

8

Lenders make loans and advances and provide other financial accommodations to the Debtors to be used by the Debtors solely for the purposes set forth in the DIP Agreement.  The ability of the Debtors to continue their businesses and reorganize under Chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such financing from the Lenders.  The Lenders are willing to make such loans and advances and provide other such financial accommodations on a secured basis and on a regular leasing basis as more particularly described herein and pursuant to the terms and conditions of the DIP Agreement and in accordance with this Interim Order.  Accordingly, the relief requested in the Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties, and is in the best interests of the Debtors, their estates and their creditors.  The Debtors represent that they are otherwise unable to obtain sufficient unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, and administrative expense priority pursuant to Section 364(a) or (b) of the Bankruptcy Code, unsecured debt having the priority afforded by Section 364(c)(1) of the Bankruptcy Code, or secured credit pursuant to Section 364(c)(2) and (3) of the Bankruptcy Code to allow for their ongoing continued operations.  The Debtors were able to obtain sufficient secured credit only by granting the liens and the superpriority claims under the terms and conditions set forth in this Interim Order and the DIP Agreement.  Additionally, the Debtors were unable to procure the necessary financing on more favorable terms than those offered by the Lenders.  The Debtors represent and the Court expressly finds that the terms of the DIP Agreement among the Debtors and the Lenders, pursuant to which the post-petition loans, fuel lines, advances, accounts receivable financing, leases, letters of credit, and other credit and financial accommodations will be made or provided to Debtors by the Lenders have been negotiated at arms length and in good faith, as that term is used in

Section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors. The Debtors further represent and the Court expressly finds that the Lenders are extending financing to the Debtors in good faith and the Lenders are entitled to the benefits of the provisions of Section 364(e) of the Bankruptcy Code. The Debtors represent that the relief requested by the Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates. Good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein and the immediate entry of this Interim Order. No party appearing in the Debtors' Chapter 11 Cases has filed or made an objection to the relief sought in the Motion and the entry of this Interim Order and to the extent any objections were made (and not withdrawn prior to the entry of this Interim Order) such objections be and herewith are overruled.

(p)     As of the date hereof, the U.S. Trustee has not appointed an official committee of unsecured creditors (the "Committee") in accordance with Section 1102 of the Bankruptcy Code.

AND THE COURT HEREBY FURTHER FINDS AND DETERMINES THAT:

(q)     Neither the Lenders, with respect to the fuel line and accounts receivable financing granted post-petition, nor the Lenders in their capacity as pre-petition lenders, as to the Existing Credit Facilities, control or otherwise direct the operations of any Debtor.

(r)     Good and sufficient cause exists for the issuance of this Interim Order to prevent irreparable harm to the Debtors' estates.

NOW, THEREFORE, IT IS HEREBY ORDERED, PENDING THE CONCLUSION OF THE FINAL HEARING:

1.     **MOTION GRANTED**. The Motion is granted insofar as it seeks interim relief subject to a Final Hearing on the Motion, and the Debtors are hereby authorized:  (a) to obtain fuel line advance privileges, obtain accounts receivable financing to borrow funds from, obtain

letters of credit from, obtain term loan secured financing, enter into leases, continue existing

leases, and continue existing term loans; (b) permit TAB to service from the availability under

the TAB A/R Agreement, post-petition, all contractual obligations on the pre-petition debt

comprising the Existing Credit Facilities and the post-petition debt comprising the DIP Loans;

and (c) incur debt to the Lenders in accordance with and pursuant to the terms and conditions of

the DIP Agreement, from and after the date of this Interim Order, whether prior or subsequent to

the execution and delivery of the DIP Agreement, and consistent, in amount and type of

expenditure, with the Budget and this Interim Order shall become effective immediately upon its

entry.  On an interim basis, the proposed borrowings and other extensions of credit and financial

accommodations under the DIP Agreement are hereby approved.  The Lenders shall have their

rights and the obligations set forth in the DIP Agreement to make loans, make and continue

leases, advances, and/or financial accommodations, issue letters of credit, service Existing Credit

Facilities, acquire new and replacement liens and cross-collateralizations, all pursuant to the

terms and conditions thereof.  The Budget may be amended, supplemented, extended or

otherwise modified and approved as set forth in the DIP Agreement so long as the changes (to

the extent not consented to in writing by Lenders) do not vary materially from Exhibit "A"

hereto, and shall be deemed to include payment of pre-petition payroll checks outstanding on the

Petition Date and other amounts approved by order of the Bankruptcy Court in order to avoid

immediate and irreparable harm.  The Textron A/R Agreement, as purchased and assigned to

TAB, shall be liquidated according to its contractual terms, from collected shipper invoices

generated from pre-petition loads hauled by or brokered by Debtors and Guarantors, and

application of all deposits and reserves held in accordance therewith, free and clear of any claim

or encumbrance of any other party.  Post-petition accounts receivable financing for all invoices

generated from loads hauled or brokered by Debtors and Guarantors post-petition shall be provided by the TAB A/R Agreement immediately post-petition.  Prior to the entry of the Final Order, the DIP Agreement may be amended, modified, supplemented or the provisions thereof waived in accordance with their terms without further order of this Court or notice to any parties; provided, however, that if such amendment, modification, supplement or waiver is material and adverse to the Debtors' estates, notice of any such amendment, modification, supplement or waiver shall be provided to the U.S. Trustee, and counsel to any Committee, each of which shall have five (5) days from the date of such notice to object and upon timely objection such amendment, waiver, modification or supplement shall only be permitted upon entry of an order of this Court.

      **2.**      **LETTERS OF CREDIT**.  Except as permitted by the DIP Agreement for letters of credit existing as of the Petition Date, the Debtors shall not apply for or obtain letters of credit from any institution or entity other than the Lenders.

      **3.**      **SUPERPRIORITY CLAIMS**.  For any and all obligations (the "***DIP Obligations"***) under and in the DIP Agreement of the Debtors to the Lenders, including the TAB A/R Agreement, the Fuel Line Agreement, the Textron Term Note and the Leases (but excluding the Textron A/R Agreement and the Real Estate Secured Loans) arising after entry of this Interim Order, and in addition to the rights granted below, the Lenders are granted and allowed superpriority administrative claim status in accordance with Section 364(c)(1) of the Bankruptcy Code having a priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by the Debtors and over any and all administrative expenses, adequate protection claims or other priority claims of any kind including as specified in, or ordered pursuant to, Sections 326, 330, 331, 503(b), 506(c), 507(a)

or 507(b) of the Bankruptcy Code, whether arising in the Debtors' Chapter 11 Cases or in a superseding Chapter 7 case.  Superpriority administrative claim status granted to the Lenders shall be senior to any superpriority claim granted as adequate protection to any other party.  As a matter of administrative efficiency, and to avoid cash flow and fueling interruptions, all post-petition advances by Lenders to fund fuel, payroll and other necessary expenses, made after the Petition Date but whether made before or after the entry of any emergency, interim or final order approving the DIP Agreement or use of cash collateral, and whether deemed advanced under the Textron A/R Agreement, the TAB A/R Agreement, or any other of the Existing Credit Facilities, shall be granted superpriority administrative claim status.

      4.    **"DIP LIENS"**.  Pursuant to Bankruptcy Code §§ 362, 363(e) and 364(c) and (d), as security for the prompt payment and performance of any and all DIP Obligations, the Debtors are hereby authorized to grant to the Lenders, valid, binding, enforceable and perfected liens, mortgages and security interests ("DIP Liens") in all the Debtors' presently owned or hereafter acquired property and assets (excluding, for purposes of this Interim Order, claims and causes of action brought under Chapter 5 of the Bankruptcy Code and proceeds thereof), whether such property and assets were acquired by Debtors before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located (collectively the "DIP Collateral"), including, without limitation:  real property (including, without limitation, all leasehold interests, mineral leases, and mineral and water rights), the Cash Collateral Account, as defined in the DIP Agreement, and all other deposit accounts, accounts, receivables (as hereinafter defined), chattel paper (including electronic chattel paper), instruments, documents (including electronic documents of title), all of Debtors' rights and claims relating to deposits and reserves held by the utilities and trade creditors, inventory, farm products, rights, equipment,

rolling stock (including titled and non-titled vehicles), general intangibles (including, without

limitation, payment intangibles, intellectual property, equity and ownership interests in

partnerships, corporations, limited liability companies and joint ventures (unless prohibited by

law, in which case the lien shall be on the proceeds of such interests), tax refunds, letter of credit

rights, supporting obligations, commercial tort claims, and investment property (other than any

equity interest held by Debtors' principals, but including proceeds of any sale or other

disposition of such equity interest).  In all such DIP Collateral that is not secured by any existing

good and valid pre-petition lien (a "Permitted Lien") such DIP Liens granted hereunder shall be

first priority senior liens pursuant to Bankruptcy Code § 364(c)(2).  With respect to all such DIP

Collateral that is subject to any Permitted Lien such DIP Liens granted hereunder shall be junior

only to each such Permitted Lien pursuant to Bankruptcy Code §364(c)(3), except with respect to

the Permitted Liens of Volvo Financial Services, a division of VFS US LLC ("Volvo"),

Lenders shall not have a junior lien and instead shall have a right of collection of any excess

proceeds, if any,  following the sale of the equipment subject to Volvo's Permitted Liens which

proceeds shall first be applied in accordance with the Volvo loan documents including

reasonable attorneys' fees.  Subject to the Carve-Out, the post-petition collateral shall not be:

(i) subject to any lien that is avoided and preserved for the benefit of the Debtors' estates under

Section 551 of the Bankruptcy Code, or (ii) subordinated to or made *pari passu* with any other

lien under Section 364(d) of the Bankruptcy Code or otherwise.  Other than the Carve-Out and as

otherwise specifically permitted to have senior priority by the terms of the DIP Agreement, no

claim or lien having a priority superior to or *pari passu* with the DIP Liens granted by this

Interim Order with respect to the DIP Obligations shall be granted or allowed, other than the

Permitted Liens, until the indefeasible payment in full, in cash and satisfaction, in the manner

provided in the DIP Agreement.  Without limiting the generality of this Paragraph 4, the Textron

Real Estate Collateral, the TAB Real Estate Collateral, and the Florida Property shall serve as

security for the DIP Credit, the DIP Obligations and the Textron A/R Agreement, the Real Estate

Secured Loans, and any pre-order, post-petition advances made to Debtors by TAB described in

the last sentence of paragraph 3 above), and shall fully cross-collateralize the Obligations and the

DIP Credit.  The legal descriptions of such real property may, at Lenders' discretion, be attached

to certified copies of this Order so that the Order may be recorded on the title to all such real

property.

5.      **USE OF PROCEEDS**.  The DIP Credit will be used for payment of operating

costs and expenses post-petition as provided for in the Budget as amended and modified as

provided in this Interim Order and the DIP Agreement.

6.      **CARVE-OUT**.  Notwithstanding any contrary provision of this Interim Order or

the DIP Agreement, the liens and superpriority claims granted to the Lenders shall be subject and

subordinate to, following the occurrence and during the pendency of a Carve-Out Event (as

hereinafter defined), the payment of costs of winding up the Chapter 11 Cases and the payment

of allowed professional fees and disbursements by the professionals retained prior to the

Termination Date pursuant to Bankruptcy Code §§ 327 or 1103(a) by the Debtors and any

statutory committees appointed in the Chapter 11 Cases ("*Professional Fees and Expenses*") in

an aggregate amount not to exceed $150,000.00 plus professional fees and expenses incurred

prior to a Carve-Out Event but not yet paid to the extent such fees and expenses are approved by

the Bankruptcy Court, plus quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6)

and any fees payable to the clerk of the Bankruptcy Court and any agent thereof (collectively the

"Carve-Out") subject to the rights of the Lenders to object (as to eligibility and amount) to the

award of any fees and expenses.  Notwithstanding anything herein to the contrary, no part of the Carve-Out or Cash Collateral may be used directly or indirectly by the Debtors, any committee or any other person or entity, to object to or contest the Obligations, the DIP Credit, any DIP Lien or to challenge (as opposed to investigate), the pre-petition loans or the pre-petition collateral or to otherwise seek affirmative relief against the Lenders.

       **7.**    **USE OF CASH COLLATERAL**.  Substantially all of the Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained by Debtors in any account or accounts, constitute proceeds of collateral and, therefore, are cash collateral of Lenders within the meaning of Section 363(a) of the Bankruptcy Code.  Use of Cash Collateral is authorized as follows:

       (a)    Cash Collateral collected after the Petition Date, but prior to the Termination Date, can be used by the Debtors to pay their post-petition obligations consistent with the Budget, provided that:  (i) all conditions precedent shall be satisfied at the time of such use as if the use of Cash Collateral were an application of loan proceeds under the DIP Agreement (and any such use of Cash Collateral shall be deemed a representation and warranty by the Debtors that such conditions have been satisfied as of the date of use of Cash Collateral as if the amount thereof were a request for an application of loan proceeds under the DIP Agreement), and (ii) such use of Cash Collateral may include provision for payment of claims of trade creditors holding valid claims allowable under Bankruptcy Code § 503(b)(9) who agree to provide goods or services to the Debtors or continue to extend credit and supply goods or services to the relevant Debtor on the terms set forth in the DIP Agreement or otherwise acceptable to the Debtors and the Lenders and further order of this Court;

16

(b)     Unless otherwise provided for immediately above, Cash Collateral collected on or after the Petition Date but prior to the Termination Date not required for the payment of expenses consistent, in amount and type of expenditure, with the Budget, shall either be held in the Cash Collateral account (as hereinafter defined) or in one or more deposit accounts maintained by the Debtors with an institution that has account control arrangements so ordered by the Court in any cash management order or as otherwise held in a manner acceptable to the Lenders until release to the Debtors to pay their post-petition obligations consistent with the Budget or, if required by the Lenders under the DIP Agreement, be applied to loans and unpaid letters of credit drawings and leases under the DIP Agreement.  Cash generated through availability under the TAB A/R Agreement shall be processed, deposited, swept, released, surcharged, discounted, drawn, and otherwise handled as required in the TAB A/R Agreement and in the DIP Agreement concerning administration of the TAB A/R Agreement;

(c)     Cash Collateral collected on or after the Termination Date shall be applied first to payment of any amounts secured by senior Permitted Liens in that cash, if any, then next to costs, fees and expenses of the Lenders (including Cash Collateral for letters of credit issued under the DIP Agreement whether or not drawn) until payment in full thereof, third to any remaining obligations under the Existing Credit Agreements according to the priorities of their respective liens therein and otherwise on the basis set forth in the DIP Agreement and, fourth, to the Debtors;

(d)     The Lenders consent to the use of Cash Collateral by any Debtors for any purpose (whether in the form of Cash Collateral or credit) shall be subject to termination if an Event of Default exists;

(e)      Cash Collateral shall not be used to obtain letters of credit from third-party lenders, other than existing letters of credit outstanding on the Petition Date with respect to which either the relevant Debtors' obligations to the issuer of such letter of credit or the obligations supported by such letter of credit are secured by cash deposits in existence on the Petition Date, as such letters of credit may be amended, modified, extended, renewed or replaced; and

(f)      Estimated fees and expenses of the Lenders, the Lenders' respective attorneys and financial consultants through the closing date up to a limit of $175,000.00, and thereafter shall be paid promptly upon invoices being provided therefore and previously invoiced amounts not yet paid, shall be paid on the closing date.  Such fees may be paid by setoff from availability under the post-petition TAB A/R Agreement.

**8.      PAYMENT OF PROFESSIONAL FEES**.  Prior to the Termination Date, the Debtors shall be permitted to pay compensation and reimbursement of expenses authorized to be paid under Bankruptcy Code §§ 328, 330, and 331, or otherwise pursuant to an Order of this Court, as the same may be due and payable (subject to the reservation of rights of the Lenders to object to approval of any such professional fees) and such payment shall not reduce the Carve-Out subject to the rights of the Lenders to object to such payments.  Upon the Termination Date and notice by the Lenders to the Debtors, any committee appointed by the U.S. Trustee and the U.S. Trustee, the right of the Debtors to pay professional fees outside the Carve-Out shall terminate and upon such occurrence, the Debtors, after receipt of the Carve-Out Event Notice from the Lenders, shall provide immediate notice by facsimile or email to all professionals in the case informing them that a Carve-Out Event has occurred and further advising them that the Debtors' ability to pay professionals is subject to the Carve-Out.

18

9.    **SECTION 506(c) LIMITATION**.  The Lenders assert respectively for their specific facilities that under the facts and circumstances of this case that there is no basis for recovery under Section 506(c) of the Bankruptcy Code and neither the Lenders nor their predecessors for their specific facilities consent to any recovery thereunder.  For purposes of this Interim Order, the Debtors have granted the Lenders a first-priority lien in the proceeds of such recovery, and the Debtors in any final order shall waive any Section 506(c) claims against the Lenders.  In light of their agreement to subordinate their liens and super-priority claims to the Carve-Out, the Lenders shall be entitled to all benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception under Section 552(b)(1) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, product, or profits of any of their collateral.

10.    **RELEASES OF CLAIMS AND DEFENSES**.  Each Debtor waives, releases and affirmatively agrees not to allege or otherwise pursue any or all defenses, affirmative defenses, counterclaims, claims, causes of action, recoupments, setoffs or other rights that it may have (i) to contest any defaults or events of defaults which could have been or were declared by the Lenders and lessors under the Existing Credit Facilities as of the Petition Date; (ii) to contest any provisions of the Loan Documents constituting the Existing Credit Facilities; (iii) to contest the amount, priority or allowance of the Debtors' indebtedness to the Lenders under the Existing Credit Facilities as of the Petition Date which amounts are expressly set forth above in this Interim Order; (iv) to contest the conduct of the Lenders under the Existing Credit Facilities in administering those facilities; or (v) to take any actions against the Lenders under the Existing Credit Facilities with respect to lender liability theories and pursuant to Sections 510, 544, 547, 548 and 549 of the Bankruptcy Code.  For purposes of this Interim Order, each Debtor

19

affirmatively states that it knows of no reason to and agrees not to (a) contest or to challenge that the mortgages, liens and security interests granted to the Lenders under the Loan Documents, whether pre-petition or post-petition, the DIP Agreement and this Interim Order are senior, valid, fully perfected, non-voidable and enforceable liens and security interests securing the post-petition obligations except as to Permitted Liens; or (b) challenge or contest that the mortgages, security interests and liens granted to the Lenders under the Existing Credit Facilities and under the Loan Documents underlying the Existing Credit Facilities, the DIP Loans, or this Interim Order are senior, valid, fully perfected, non-voidable and enforceable mortgages, security interests and liens fully securing the Existing Credit Facilities and the DIP Loans (the "Lien Finding").  The Debtors understand that in conjunction with the entry of a Final Order approving the debtor-in-possession financing, the Lenders will require a final waiver and release of any challenges and an affirmative admission of the Lien Finding; provided that the Debtors agree not to contest the Lien Finding but any committee appointed by the U.S. Trustee or any party with standing to challenge such liens may file an objection ("Objection") to the Lien Finding within sixty (60) days after the date of appointment of such committee (the "Objection Period") or be forever barred from challenging the Lien Finding.  Absent any such Objection, the Lien Finding shall automatically be final at the end of the Objection Period.  Any objection to the Lien Finding shall be ruled upon by the Court ("*Lien Validation Process*").

     **11.**    **FEES AND EXPENSES**.  In addition to any rights granted to the Lenders under the DIP Agreement and under this Interim Order, the Lenders shall be entitled to charge the Debtors' accounts wherever located or receive reimbursement thereof, without application to the Court, for: (a) all of the Lenders' reasonable fees and expenses, reasonable attorneys' fees and legal expenses, to a limit of $175,000.00 and other advisor or professional fees and expenses

incurred in connection with the DIP Agreement or any actions taken in connection with these Chapter 11 Cases, including without limitation the negotiating, closing, documenting and obtaining of Court approval thereof.  Borrowers shall pay in addition, all of Lender's cost, expenses and attorneys' fees incurred in all proceedings in connection with the interpretation, amendment, modification, enforcement or carrying out of the DIP Agreement or this Interim Order at any time, and all expenses, costs and charges in any way or respect arising in connection therewith or related thereto; and (b) all of the Lenders' facility, administrative and filing fees, recording taxes and fees, title insurance premiums and fees, reasonable internal examination and audit expenses; and such fees and expenses in the foregoing subparagraphs (a) and (b) (collectively, the "*Reimbursable Fees")* shall be funded through loans under the DIP Loans, charged to the Debtors' account and shall constitute a part of the Debtors' obligations under the DIP Loans but shall not constitute an item paid in accordance with the Budget; *provided, however*, that the Lenders shall submit copies of their professional fee invoices to the Debtors.  Lenders may pay such costs by offset against the availability generated under the TAB A/R Agreement post-petition.

  **12.**  **COLLATERAL INSURANCE AND PAYMENT OF TAXES**.  The Debtors, at their expense, shall (a) continue to, at all times, keep the Collateral and all leased equipment insured against all loss, peril and hazard as provided for in the DIP Agreement and make the Lenders co-insureds and mortgagee's and lender's loss payee as their interests appear under such policies, and (b) pay any and all post-petition taxes, assessments and governmental charges with respect to such Collateral and leased equipment (when, if, and as required by the Leases), all as provided under the DIP Agreement, and will provide the Lenders with proof thereof upon written demand and will give the Lenders access to their records in this regard.  At the closing of the DIP

Agreement, the Debtors shall furnish to the Lenders evidence, in form and substance reasonably satisfactory to the Lenders, of insurance coverages (which shall be reasonably satisfactory to the Lenders), showing the Lenders as mortgagee's, lender's, and lessors' loss payee thereunder with respect to their respective interests as to casualty and business interruption insurance and reflecting all affirmative coverage requested by the Lenders and for the protection of their interests.

**13.    ACCOUNTS RECEIVABLE PROCEEDS**.  In accordance with the provisions of the DIP Agreement and this Interim Order, and particularly with the TAB A/R Agreement facility, if required by the Lenders to the extent shipper invoice payments are not paid directly to TAB, Debtors are authorized and directed to remit, in kind, immediately to the Lenders, all monies, checks, drafts and any other payments or collections received from Debtors' account debtors, shippers, and other parties, now or hereafter obligated to pay Debtors or any prior existing securitization (including, but not limited to, the Textron A/R Facility) for services provided by Debtors or for inventory, equipment, or other property of Debtors' estates.  The Lenders are authorized to apply such payments and proceeds received by Debtors to the Obligations in accordance with the DIP Agreement and this Interim Order.  Specifically, Lenders may pay from availability under the TAB A/R Agreement, prior to remitting funds to Debtor or any other person or entity, the past due and ongoing contractual payments due under the Leases, the TAB A/R Agreement (including fees, discounts and reserves), the Real Estate Secured Loans, the Fuel Line Agreement, the Textron Term Note, the Textron A/R Facility (in the event of liquidation deficiencies), attorneys' fees, Reimbursement Obligations, and any other obligation created under the DIP Agreement.

BDDB01 5590494v4
877432.2

14.    **AUTOMATIC LIEN PERFECTION AND MODIFICATION OF**

**AUTOMATIC STAY**.  All liens granted herein and in the DIP Agreement to or for the benefit

of the Lenders shall, pursuant to this Interim Order be, and thereby are, valid, enforceable and

perfected, effective as of the date of the entry of the Interim Order, and (notwithstanding any

provisions of any agreement, instrument, document, the Uniform Commercial Code or any other

relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be

required to effect such perfection, and all liens on any other deposit accounts shall, pursuant to

this Interim Order be, and they hereby are, deemed to confer "control" for purposes of

Sections 8-106, 9-104 and 9-106 of the Uniform Commercial Code as in effect as of the date

hereof in favor of the Lenders consistent with their interests.  The automatic stay provisions of

Bankruptcy Code § 362 are hereby modified to permit (a) the Debtors to implement the terms of

the DIP Agreement, (b) the Debtors to create, and the Lenders to perfect, any and all liens,

mortgagees and security interests granted to them hereunder; *provided, however*, that Lenders

shall not be required to file UCC financing statements, mortgages, trust deeds, or other

instruments with any other filing authority to perfect any lien, mortgage or security interest

granted by this Interim Order or take any other action to perfect such liens, mortgages and

security interests, including all liens, mortgages and security interests declared in the Existing

Credit Facilities, and each of them, and the Loan Documents supporting the Existing Credit

Facilities as well as the liens, mortgages and security interests declared in the TAB A/R

Agreement and the Fuel Line Agreement, such perfection of liens, mortgages and security

interests are hereby deemed automatically perfected; if, however, the Lenders shall, in their sole

discretion, elect, for any reason, to file, record or serve any such financing statements, this

Interim Order, or other documents with respect to such liens and security interests, the Debtors

23

shall execute the same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made the date of and with the priority of such liens and security interests as provided for in this Interim Order.  Without limiting the generality of this foregoing Paragraph 14, the Textron Real Estate Collateral and the TAB Real Estate Collateral shall serve as security for the Obligations and the DIP Credit (including but not limited to the TAB A/R Agreement, the Textron A/R Agreement, the Textron Term Note, the Real Estate Secured Loans, the Fuel Line Agreement and the Leases), and shall fully cross-collateralize the Obligations and DIP Credit.  Lenders shall be granted a junior lien on all DIP Collateral that is subject to and encumbered by a Senior Permitted Lien.

       15.     **MODIFICATION OF PAYMENT DEADLINES**.  The time of payment of any and all obligations of the Debtors arising out of, treated in, or incurred pursuant to the DIP Agreement shall not be altered, extended or impaired by any plan or plans or reorganization that may hereafter be accepted or confirmed or any further orders of the Court which may hereafter be entered.

       16.     **TERMINATION EVENTS**.  Any and all Obligations of one or more of the Debtors arising out of, or incurred pursuant to, the DIP Agreement, shall be immediately due and payable, the Lenders shall have no obligation to make loans and/or advances to the Debtors, and the DIP Agreement shall terminate, upon the occurrence of (1) March 31, 2010 or an earlier Maturity Date provided for in the DIP Agreement (the "*Maturity Date*"), or (2) any of the following events upon notice to the Debtors being given by the Lenders ("*Terminating Events*" or "*Termination Event*"):

       (a)     Any one or all of the Chapter 11 Cases of any of the Debtors shall be dismissed or converted to a Chapter 7 case.

24

(b)    A Chapter 11 Trustee shall be appointed in the Chapter 11 Cases of any of the Debtors.

(c)    Other than Permitted Liens, any other superpriority claim or lien equal or superior in priority to that granted pursuant to or permitted under the Interim Order, any other interim order entered in connection herewith and the Final Order other than the Carve-Out or permitted to be equal or senior by the terms of the DIP Agreement (the Interim Order and the Final Order, collectively, the "*Financing Orders*") shall be granted;

(d)    A Financing Order shall be amended, reversed, stayed, vacated or otherwise modified, in the case of an amendment or modification, in a way that materially and adversely affects the rights of the Lenders and that is not acceptable to the Lenders, in their sole discretion, as set forth in the DIP Agreement;

(e)    The automatic stay of Bankruptcy Code § 362 shall be lifted as to allow a third party to proceed against any asset of the Debtors with a value in excess of $100,000 in the aggregate;

(f)    An examiner or other person having enlarged powers under Section 1106(b) of the Bankruptcy Code shall be appointed;

(g)    A material adverse change shall occur in the condition or prospects, financial or otherwise, of any of the Debtors and their affiliates and subsidiaries, taken as a whole, after the Petition Date;

(h)    The failure of any of the Debtors to comply with the Financing Orders;

(i)    The failure to obtain a Lien Finding acceptable to the Lenders within 60 days (or such later date as may be agreed to by the Lenders) after the appointment of a Committee;

25

(j)    The Final Order shall not be entered within 45 days after the Petition Date or such later date as to which the Lenders may agree;

(k)    The occurrence of any other Event of Default as defined in the DIP Agreement;

(l)    If any of the Debtors seek an order in the Debtors' Chapter 11 Cases or support any applications therefore that authorize (without (a) all obligations outstanding to the Lenders under the DIP Agreement fully being indefeasibly satisfied in full in cash or (b) the Lenders providing their prior written consent): (i) under Bankruptcy Code § 363, the use of Cash Collateral in which the Lenders have an interest, or the sale, use, or lease, other than in the ordinary course of business, of other property of the Debtors in which the Lenders have an interest; (ii) the obtaining of credit or the incurring of indebtedness pursuant to Bankruptcy Code §§ 364(c) or (d), or any other grant of rights against the Debtors and/or their estates, secured by a lien, mortgage or security interest in the Collateral held by the Lenders or entitled to priority administrative status which is junior, equal or superior to that granted to the Lenders herein; (iii) to the extent permitted by law, the return of goods by the Debtors pursuant to Bankruptcy Code § 546(c); or (iv) an order dismissing the Chapter 11 Cases, or any of them.

**17.    RIGHTS UPON OCCURRENCE OF TERMINATING EVENT**.  Upon the occurrence of a Terminating Event or upon the occurrence of the Maturity Date:

(a)    (1) The Debtors shall immediately segregate all of the Collateral, including without limitation Cash Collateral, and shall not be permitted to use such Collateral absent the Lenders' prior written consent, and (2) the Lenders may:

(i)    declare the principal of and accrued interest on the outstanding DIP Loans and the Existing Credit Facilities to be immediately due and payable, and

26

(ii)     terminate the DIP Commitments and thereby terminate any further commitments to extend any further financing under the DIP Agreement to the Debtors.

(b)     After the Terminating Event, the Lenders shall have the right, free of the restrictions of Bankruptcy Code § 362: (1) to take immediate reasonable action to protect and preserve the Collateral; and (2) after giving three (3) business days' prior written notice of a Terminating Event (the "*Termination Notice*") to the Debtors, counsel for any Committee and the U.S. Trustee ( the "*Notice Parties*"), to take any or all of the following actions without further order or an application to the Court:

(1)     Set off amounts in accounts (including any existing accounts maintained by the Debtor with the Lenders) or otherwise take steps to foreclose upon the Collateral for the DIP Loans and the Existing Credit Facilities.

(2)     Require that any Cash Collateral be applied against the DIP Loans, in accordance with the DIP Agreement.

(3)     Require payment of the Default Rate on the DIP Loans, in accordance with the DIP Agreement.

(4)     Proceed with the remedies set forth in the DIP Agreement, including without limitation, foreclosure of the Collateral with proceeds applied as set forth in the DIP Agreement and take any other actions permitted by the applicable documents, at law or otherwise.

(5)     Nothing herein shall, at any time, stay, limit or encumber the Lenders' ability to foreclose against real estate or other collateral pledged to secure the Real Estate Secured Loans, in accordance with the contractual terms of those loans, which real estate and

other collateral is pledged by non-debtor guarantors and is not property of any of the Debtors'
estates.

(c)      In any hearing regarding any exercise of rights or remedies, the only issue that
may be raised by any party in opposition thereto shall be whether, in fact, a Terminating Event
has occurred and is continuing, and the Debtors hereby waive their right to seek relief, including,
without limitation, under Section 105 of the Bankruptcy Code, to the extent such relief would in
any way impair or restrict the rights and remedies of the Lenders set forth in this Interim Order,
the Loan Documents, or the DIP Agreement.  In no event shall the Lenders be subject to the
equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

(d)      Subject to the provisions of this Interim Order, if the automatic stay is deemed
lifted as to the Collateral, and the Lenders can proceed with the remedies permitted by the DIP
Agreement, then the automatic stay shall also be deemed lifted as to the Pre-Petition Collateral
and the Lenders shall be able to proceed with the remedies permitted by the Pre-Petition Loan
Documents, as provided in paragraph 17(b)(5) above and otherwise.

**18.     RIGHT TO SEEK FURTHER RELIEF**.  Nothing in this Interim Order shall
limit the rights of the Lenders to seek further relief (including additional adequate protection) or
modification or termination of the automatic stay for good cause shown.

**19.     ASSIGNMENT OF RIGHTS**.  Nothing in this Interim Order shall limit the
rights of any Lender to assign all of its rights, claims and obligations under the DIP Agreement
or the Loan Documents, or to obtain or sell participation interests in the same.

**20.     REPORTS.**  The Debtors shall provide the Lenders with such written reports,
certified by the president, vice-president, chief restructuring officer, chief financial officer,
controller or the vice president and assistant to the treasurer and chief financial officer of the

Debtors to be accurate to the best of his or her knowledge, information and belief, and such additional written reports as the Lenders in their reasonable discretion, shall require, in each case as provided under the terms of the DIP Agreement.  These reports shall be submitted in addition to the monthly operating reports required to be submitted under the Bankruptcy Code, Bankruptcy Rules, Local Rules, and U.S. Trustee guidelines.

21.    **MAINTENANCE OF BOOKS AND RECORDS**.  The Debtors are directed to keep their books and records of original entry, including without limitation, records of sale, credits authorized (whether or not credit memoranda have been issued), purchases, accounts receivable, bills of lading, cash receipts, and cash disbursements, current and updated, so that all business activity is posted to them in the ordinary course of the Debtors' businesses.

22.    **INSPECTION OF BOOKS AND RECORDS**.  The Lenders shall have the right to inspect, audit, examine, check, make copies of or extracts from the books, accounts checks, orders, invoices, bills of lading, correspondence and other records of the Debtors, and the Debtors shall make all of same available to the Lenders and their representatives, for such purposes.

23.    **LOCKBOX SYSTEM**.  If and as requested by the Lenders, the Debtors shall implement a blocked account or lockbox system for their receivable (in form and substance reasonably satisfactory to the Lenders) in accordance with the terms of the TAB A/R Agreement and/or the Cash Management Order.

24.    **DEPOSIT OF FUNDS IN CASH COLLATERAL ACCOUNTS**.  To the extent that all cash and checks of the Debtors currently in their possession, bank accounts, lockbox accounts or otherwise, and the proceeds thereof, if any, are proceeds of the Collateral, upon entry of this Interim Order, if requested by the Lenders pursuant to the terms of the DIP

29

Loans or as required by the DIP Agreement, the Debtors shall deliver such proceeds to the Lenders for deposit into the Cash Collateral Account, and thereafter the Debtors and any successor to the Debtors, including without limitation any successor trustee or trustees, shall immediately deliver any and all payments or proceeds realized upon the sale, liquidation, collection or disposition of the Post-Petition Collateral or Pre-Petition Collateral, including without limitation the proceeds of sales authorized pursuant to Bankruptcy Code § 363 or any plan of reorganization ("*Proceeds*") that come into their possession to the Lenders, in the form received for deposit into the Cash Collateral Account.

25.     **ACCRUAL OF INTEREST**.  Lenders are authorized to accrue interest on the outstanding balance of the obligations due under the DIP Agreement pursuant to the Loan Documents, and to apply remittances from the Debtors against interest as set forth herein and therein.

26.     **APPLICATION OF PROCEEDS**.  Subject to the other terms of this Interim Order, the Lenders authorized, notwithstanding the provisions of Bankruptcy Code § 362, to retain and apply the Proceeds of the Post-Petition Collateral including the Pre-Petition Collateral as follows:

(a)     To the extent that any sales of assets occur prior to the Termination Date and outside the ordinary course of business (none to occur without Bankruptcy Court approval and with the Lenders reserving all rights, if any, to object to any such sale), 100% of the Net Proceeds thereof, after satisfying any Permitted Liens, in excess of $25,000 in the aggregate (the "*Prepayment Amount*") must be paid to the Lenders until the Obligations are paid in full (including cash collateralizing (at 105%) of all Letters of Credit).  Asset sale proceeds shall not include any casualty or condemnation proceeds to the extent any of the Debtors has elected to

30

use such proceeds to repair, rebuild, or replace the assets subject to such casualty or condemnation, no Event of Default exists and solely to the extent of proceeds in excess of $25,000 or such higher amount as the Lenders may approve with respect to any single casualty or condemnation event, the Lenders have approved such repair, rebuilding or replacement.  Any property so repaired, rebuilt or replaced shall automatically constitute part of the Post-Petition Collateral and shall be subject to the Lenders' Liens.  As used herein with respect to asset sales, the term "*Net Proceeds*" shall mean the gross sale price less actual taxes payable and the reasonable out-of-pocket costs of such sale (including without limitation, broker's fees and closing costs) and the amount of all obligations secured by Permitted Liens that are senior to the Lenders' Liens.  Any such proceeds of sale designated to pay such taxes and costs of sale which are not required to be disbursed at the closing of such sale shall be held in escrow by the Lenders and shall be subject to the lien of the Lenders until applied to pay such taxes and costs of sale and the amount of all obligations secured by Permitted Liens, if any, that are senior to the Lenders in the Collateral.

(b)     Following any asset sale outside the ordinary course of business in excess of $25,000 in the aggregate, the Budget shall be redetermined to the satisfaction of the Lenders.

(c)     On or after the occurrence of the Termination Date, all payments and collections from Collateral (including asset sales) shall be applied:  *first*, to satisfy any obligation secured by any Permitted Lien, *second* to pay the Carve-Out, *third* to the costs, fees and expenses of the Lenders; *fourth*, to interest and fees and then to permanently reduce the obligations outstanding under the DIP Agreement; *fifth*, to provide cash collateral for Letters of Credit outstanding under the DIP Agreement (at 105%); *sixth* until released or applied as provided in the DIP Agreement, to reduce the obligations still unsatisfied under the Existing Credit Facilities; and *last*, to the

31

relevant Debtor or as otherwise required by applicable law pursuant to further Court order; *provided, further,* that (i) upon the Termination Date any consent to use of Cash Collateral given by the Lenders shall terminate and any rights of the Debtors to use cash collateral granted under this Interim Order or the Loan Documents shall cease on the Termination Date and (ii) such applications of the Proceeds set forth above shall be free and clear of any claim, charge, assessment or other liability.  Notwithstanding the application of Proceeds set forth above, Cash Collateral collected after the Petition Date but prior to the Termination Date may be used by the Debtors to pay an essential trade creditor who has entered into a written agreement to supply goods and services on terms in effect or such other terms as are acceptable to the Debtors with Lender approval consistent with the terms of the DIP Agreement.

27.     **NOTICE OF NON-RENEWAL LETTER OF CREDIT BENEFICIARY**.

The automatic stay shall be deemed modified so as to enable the Lenders to give to a beneficiary of a Letter of Credit issued or existing under the DIP Agreement a notice of non-renewal in accordance with the terms thereof.

28.     **SECTION 364(e)**.  Pursuant to, and to the extent of, the provisions of Bankruptcy Code § 364(e), the liens, mortgages and security interests granted by and subject of this Interim Order shall be binding on the Debtors, their estates and their successors and assigns even if this Interim Order is reversed or modified on appeal.  For purposes of this Interim Order, the term "appeal" as used in Section 364(e) of the Bankruptcy Code shall be construed to mean a proceeding for appeal, reconsideration, amendment, rehearing or re-evaluation of this Interim Order by this Court or any other tribunal.

29.     **SURVIVAL OF LIENS.**  If an order dismissing the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall

BDDB01 5590494v4
877432.2

provide (in accordance with Sections 105 and 349(b) of the Bankruptcy Code) that (i) the claims and liens granted pursuant to this Interim Order to or for the benefit of the Lenders and in conjunction with any facility addressed herein, including but not limited to the Real Estate Secured Loans, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all obligations in respect thereof shall have been indefeasibly paid in full in cash and satisfied in the manner provided in the DIP Agreement, the Pre-Petition Loan Documents, the TAB A/R Agreement, the Fuel Line Agreement, the Leases, the Textron Term Note and this Interim Order (and that such claims and liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and liens.

30.     **AUTHORIZATION TO TAKE CERTAIN ACTIONS**.  The Debtors are hereby authorized to do and perform all acts and to make, execute and deliver all instruments and documents that may be required or necessary for the performance of the DIP Loans including, without limitation, the delivery to the Lenders of the original checks or other forms of remittance received by the Debtors which are the proceeds of the Post-Petition Collateral, and the payment by the Debtors of any monies or assets in their possession of all sums required to be paid to the Lenders under the DIP Agreement.

31.     **IMMEDIATE EFFECT OF ORDER.**  Notwithstanding Bankruptcy Rule 7062, the terms and conditions of this Interim Order shall be:  (a) immediately enforceable pursuant to Bankruptcy Rule 8005; and (b) not be stayed absent (1) an application by a party in interest for such stay in conformance with such Bankruptcy Rule 8005, (2) a hearing upon notice to the Debtors and the Lenders and (3) entry of an order granting such stay.

33

32.    **SURVIVAL OF LIENS AND PRIORITY**.  No rights, claims or liens of the

Lenders, pre-petition or post-petition, granted hereunder shall be modified in any plan of

reorganization or subsequent filing.  The provisions of this Interim Order and all obligations of

the Debtors in the DIP Agreement or this Interim Order and any actions taken pursuant hereto

shall survive entry of any orders which may be entered confirming any plan of reorganization or

which may be entered converting these Chapter 11 Cases from Chapter 11 to Chapter 7 of the

Bankruptcy Code; *provided, further*, that the terms and provisions of this Interim Order, as well

as the liens, mortgages and security interests granted under the DIP Loans, shall continue  in this

or any superseding case under the Bankruptcy Code and such liens, mortgages and security

interests shall maintain their priority as provided by this Interim Order until the DIP Loans and

all credits under the Existing Credit Facilities are satisfied in full.

33.    **MODIFICATION OF INTERIM ORDER**.  Nothing in this Interim Order shall

limit the Lenders' rights to seek modification of this Interim Order (with the consent of the

Debtors if no Default or Event of Default exists) or for cause if a Default or Event of Default

exists.

34.    **RIGHTS AGAINST THIRD PARTIES**.  Nothing in this Interim Order shall in

any way prejudice or compromise any rights the Lenders may have against parties other than the

Debtors.

35.    **NO UNINTENDED BENEFICIARIES**.  The provisions of this Interim Order

shall be binding upon and insure to the benefit of the Lenders, the Debtors, the Debtors' estates

and their respective successors and assigns (including any trustee appointed as a representative

of any Debtor's estate or in any subsequent proceeding under the Bankruptcy Code).  Except as

explicitly provided for herein, this Interim Order does not create any rights for the benefit of any other party, creditor, equity holder, or any other direct, indirect or incidental beneficiary.

36.    **ORDER CONTROLLING**.  To the extent that any of the provisions of this Interim Order shall conflict with any of the provisions of the DIP Agreement, this Interim Order is deemed to control and shall supersede the conflicting provision(s) in the DIP Agreement.

37.    **NUNC PRO TUNC EFFECT**.  Upon entry of this Order, this Order shall be effective nunc pro tunc to the Petition Date.

###

BDDB01 5590494v4
877432.2

**Exhibit A**
**Budget**

**Exhibit B**
**Schedule of Permitted Liens**