IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Summitt Logistics & Brokerage, LLC, et al.,[1] | ) | Case No. 09-90630-BHL-11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DISCLOSURE STATEMENT TO DEBTORS'
CONSOLIDATED PLAN OF REORGANIZATION**

## I.    INTRODUCTION

Summitt Logistics & Brokerage, LLC ("Logistics"), Summitt Trucking, LLC

("Trucking"), Tractor Leasing, LLC ("Tractor Leasing"), and Trailer Leasing, LLC ("Trailer

Leasing") (collectively, the "Debtors"), submit this Disclosure Statement to Debtors'

Consolidated Plan of Reorganization pursuant to § 1125 of the Bankruptcy Code (the

"Disclosure Statement") to all holders of Claims[2] against or Interests in the Debtors. The Debtors

believe that the Disclosure Statement contains "adequate information", as that term is defined in

§ 1125(a)(1) of 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), for holders of Claims against

or Interests in the Debtors as required by § 1125 of the Bankruptcy Code.  The "adequate

information" herein provided consists of information of a kind, and in sufficient detail, as far as

is reasonably practicable in light of the nature and history of the Debtors and the condition of the

Debtors' books and records, that would enable a hypothetical reasonable investor typical of the

holders of Claims against or Interests in the Debtors to make an informed judgment about the

---

[1]    Capitalized terms used but not defined in the Disclosure Statement shall have the meanings given to them in the Debtors' Consolidated Plan of Reorganization and reference should be made thereto. The Debtors' Consolidated Plan of Reorganization is attached hereto as **Exhibit 1**.

[2]    The Debtor entities are Summitt Logistics & Brokerage, LLC ("Logistics"), Summitt Trucking, LLC ("Trucking"), Tractor Leasing, LLC ("Tractor Leasing"), and Trailer Leasing, LLC ("Trailer Leasing").

Debtors' Consolidated Plan of Reorganization dated September 10, 2011 (as subsequently amended or modified, the "Plan"), and whether to accept or reject the Plan. The transmittal of the Disclosure Statement does not represent, and should not be interpreted as being, the Bankruptcy Court's recommendation to either accept or reject the Plan.

THE DESCRIPTION OF THE PLAN IN THE DISCLOSURE STATEMENT IS A SUMMARY ONLY AND CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THIS ENTIRE DISCLOSURE STATEMENT AND ITS EXHIBITS, THE DETAILED DESCRIPTION OF THE PLAN CONTAINED HEREIN, AND THE PLAN ITSELF, WHICH IS ANNEXED HERETO AS EXHIBIT 1, FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS.

NO STATEMENTS OR INFORMATION CONCERNING THE DEBTORS OR ANY DISTRIBUTION PURSUANT TO THE PLAN HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT. ACCORDINGLY, NO REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD BE RELIED UPON IN EXERCISING THE RIGHT TO VOTE OR NOT VOTE ON THE PLAN AND ANY SUCH REPRESENTATION OR INDUCEMENT SHOULD BE REPORTED TO THE DEBTORS' COUNSEL. THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE RECORDS KEPT BY THE DEBTORS AND INFORMATION PROVIDED HEREIN ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

BDDB01 6851331v1

EXCEPT AS OTHERWISE INDICATED, THE STATEMENTS IN THIS DISCLOSURE STATEMENT ARE MADE AS OF SEPTEMBER 10, 2011 AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, IMPLY THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER SEPTEMBER 10, 2011. ANY ESTIMATE OF CLAIMS OR INTERESTS IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS OR INTERESTS ALLOWED BY THE BANKRUPTCY COURT.

YOU SHOULD NOT CONSTRUE THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. YOU SHOULD, THEREFORE, CONSULT WITH YOUR OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS IN CONNECTION WITH THE PLAN AND TRANSACTIONS CONTEMPLATED IN THE PLAN, THE SOLICITATION OF VOTES ON THE PLAN AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THE ABSENCE OF PENDING OBJECTIONS TO CLAIMS OR PENDING AVOIDANCE ACTIONS OR THE ABSENCE OF AN INDICATION HEREIN OF POTENTIAL OBJECTIONS TO CLAIMS OR AVOIDANCE ACTIONS, SHALL NOT SERVE AS A WAIVER OF SUCH RIGHTS, AND ALL CREDITORS AND PARTIES IN-INTEREST ARE HEREBY EXPRESSLY ON NOTICE THAT THEY SHOULD NOT RELY ON THE DISCLOSURE STATEMENT OR ABSENCE OF NOTICE OF AN OBJECTION OR POSSIBLE AVOIDANCE ACTION UNDER §  542-550 OF THE

BDDB01 6851331v1

**BANKRUPTCY CODE, AS A DEFENSE TO SUCH FUTURE OBJECTION OR AVOIDANCE ACTION.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT IS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER.**

**II.    HISTORY AND BACKGROUND OF THE DEBTORS**

Each of the Debtors, Logistics, Trucking, Tractor Leasing, and Trailer Leasing are Indiana limited liability companies and are manager-managed.  The single member of each of the Debtors is Summitt Holdings, LLC ("Holdings").  Holdings is owned by David L. Summitt, Jenny Summitt (David's wife) and Stock Investments, LLC, an entity owned by Jesse Ballew.

Headquartered at 1800 Progress Way, Clarksville, Indiana (the "Headquarters"), the Debtors are primarily engaged in short and long haul over the road shipping and warehousing.  Logistics provides brokerage services to Trucking, as well as warehousing and brokerage services to other customers. Trucking transports the loads brokered by Logistics and leases its fleet from Tractor Leasing and Trailer Leasing.  The Debtors operate as a single integrated business and generate and report income and expenses on a consolidated basis.

The Debtors broker and transport freight within the 48 continental states, but primarily in the Midwest within a 500 mile circle of Louisville.  On the Petition Date, the Debtors operated 335 trucks and 883 trailers (including 71 refrigerated units), and employed nearly 400 employees.  In 2008, the year immediately prior to the filing of these chapter 11 cases, the Debtors had gross revenues of $87,197,961.00.

III.    **EVENTS LEADING TO CHAPTER 11 PETITION AND DURING CHAPTER 11 PROCEEDINGS**

The trucking industry is a highly competitive industry that is very sensitive to economic fluctuations.  Prior to 2007, demand for trucking services had grown dramatically, resulting in a shortage of commercially licensed drivers and an increased demand for rolling stock.  Not anticipating the unique economic circumstances that precipitously occurred in third and fourth quarters of 2008 (including wildly fluctuating fuel prices, tight credit, and a recession), the Debtors entered into driver contracts and financing contracts that became unsustainable in the rapidly deteriorating economy.  The Debtors began to experience severe cash flow problems due to the economic instability, dramatic increases in fuel prices, and reduced volumes in freight due to the economic crisis.

As the economy continued to weaken into 2009, demand for goods dropped off and fewer customers needed fewer loads hauled.  It became apparent that the Debtors would either (i) need the protections and breathing room of chapter 11 filings to complete their restructuring into a smaller, profitable company or (ii) find a buyer for the businesses or the assets.

Prior to the filing of these Chapter 11 Cases and throughout 2008 and into early 2009, the Debtors undertook a restructuring of their business to, among other things, eliminate unnecessary costs, increase revenues by raising freight charges, rework unprofitable routes and services, reduce the number of employees, and terminate the employer 401(k) match.  The Debtors also undertook an extensive search for additional or new credit to assist turning the businesses towards a profitable bottom line.  The Debtors sought additional lines of credit from existing lenders and also from potential lenders who were recommended by the Debtors' customers and advisors.   The Debtors employed financial advisors and an investment banker to

- 5 -

BDDB01 6851331v1

explore the sale of the businesses from June 2008 through December 2008, but no offers materialized either to purchase the companies or to finance a restructuring.

As it became more clear that a chapter 11 filing was necessary, the Debtors and their financial advisors and investment bankers sought expressions of interest from potential lenders to provide debtor-in-possession financing. Turning first to their current senior lender, Textron Commercial Finance ("Textron"), the Debtors sought an increase in a line of credit to smooth cash flow fluctuations. However, Textron was experiencing its own financial difficulties and unknown to the Debtors was on the verge of financial collapse.

The Debtors made contact with Transportation Alliance Bank, Inc. ("TAB") and Transportation Alliance Leasing, Inc. ("TAL"). TAB and TAL were the only entities that showed interest in providing debtor-in-possession financing with terms that would provide operating capital to restructure the businesses. Just prior to the Debtors' filing, TAB purchased the Debtors' debt from Textron, and the Debtors and TAB negotiated a post petition credit facility to provide the Debtors with a continuation of their receivables financing as well as lease-financing of tractors and trailers.

## IV.    SIGNIFICANT DEVELOPMENTS DURING THE CHAPTER 11 CASE

On the Petition Date, the Debtors filed their Motion for Post-Petition Financing (the "Financing Motion") to enable them to utilize the cash and accounts receivable in which TAB held a security interest and to enter into a post-petition credit agreement (the "Post-Petition Credit Agreement") with TAB. The Post-Petition Credit Agreement has amended and restated seventeen times, most recently on August 31, 2011, primarily extending the maturity date. Under the Post-Petition Credit Agreement, TAB continued to extend credit through factoring of the Debtor's accounts receivable as well as a credit line to cover variable costs. TAB and TAL restructured some of its payments under sales and leases of equipment to provide the Debtors

- 6 -

some relief on their operating costs.  In 2010, the DIP facility was amended to allow for an overline advance of up to $1 million to provide the Debtors with capital to meet certain tax and licensing obligations and in addition, restructured and replaced some of the Debtors' fleet equipment with other equipment financed by TAB and/or TAL.  Under the order authorizing the Post-Petition Credit Agreement, TAB and TAL were awarded a superpriority administrative expense claim to the extent it was not repaid by the Debtors or through liquidation and collection of its collateral.

In addition to the financing provided by TAB and TAL, the Debtors financed part of their fleet through certain equipment lenders under financing leases.  In the first months of the Chapter 11 Cases, the Debtors negotiated a return of some of the equipment and adequate protection stipulations for the remaining equipment.  More recently and following additional downsizing of the Debtors' fleet, the Debtors' equipment lenders have been reduced to three lenders other than TAB and TAL, with all other equipment returned to the applicable equipment lender.

Other "First Day" motions were filed and granted allowing the Debtors to continue with their banking and depository accounts, pay prepetition wages and benefits up to the limits allowed as priority claims under § 507 of the Bankruptcy Code, establish adequate protection for utilities, pay taxes and maintain insurance, all to continue their businesses during the Chapter 11 Cases.

On March 16, 2009, the United States Trustee appointed the Official Committee of Unsecured Creditors of the Debtors (the "Committee"). The Committee is represented by Frost, Brown, Todd LLP.  The US Trustee convened and concluded the first meeting of creditors and the Debtors have continued to operate as debtors-in-possession throughout the Chapter 11

Cases. The Committee reserved its right to challenge the liens of TAB under the Post-Petition Credit Facility.

        The Debtors engaged the firm of Baker & Daniels LLP, Indianapolis, Indiana as its bankruptcy counsel.  Kraft CPAs LLP ("Kraft") was engaged as the Debtors' restructuring advisor, and KSM CPA LLP ("KSM") was retained as their accounting firm.  The Debtors also engaged KSM Transport Advisors LLC ("KSMTA") as operational and financial advisors to assist the Debtors in examining and improving their operations and increasing the economic efficiency of the businesses.  KSMTA undertook an extensive viability review of the Debtors' operations, customer base, fleet condition, route analysis, management structure, and driver contracts and generated a report of suggested operational and fleet changes to increase profitability and operational efficiency.  KMSTA concluded that the Debtors were a viable business.  KSMTA also began the creation of a computer program that would identify and track key criteria of the Debtors' operations and tie those criteria to current operations and financial performance to give the Debtors real time linkage between operations and financial performance.

        The Debtors took the report generated by KSMTA and began implementing some of the key points.  Specifically, the Debtors began readjusting the fleet, reducing tractors and trailers, and exchanging certain equipment for other equipment to reach a fleet size and composition that fit the customer base and region in which the Debtors operated and responded to the challenging economy.  Some of these operational improvements included:

- Reduced fleet size to 205 tractors and 517 trailers and in the process traded in older, less efficient equipment for newer equipment that has less maintenance costs and fuel costs as well as attempting to reduce the variety of engine and transmission models to reduce maintenance and parts costs

- Overall reduction in the number of employees

- Reduced wages and salaries for hourly employees, management, and drivers and froze wage increases

- 8 -

- Restricted driver contracts to only those drivers within service area to reduce empty-mile costs

- Reduced employee hours and overtime

- Implemented new computer program to analyze and optimize fuel purchases and freight lane profitability, and efficiently bid customer freight work

- Implemented 24/7 maintenance and improved maintenance reporting including pre-arrival alerts of maintenance issues

- Eliminated in-house services that could be more efficiently and cost-effectively performed by outside vendors

- Reviewed supplier relationships and negotiated reduced costs and implemented more strict purchase and payment controls

- Implemented a system to for adhering to engine and transmission parameters to ensure maximum operational efficiency

- Reduced inventory of supplies and parts to increase cash availability

- Consolidated operational staff into one area to increase planning and coordination

- Improved tracking of fuel used by customer to increase accuracy of fuel surcharging

- Evaluated routes and customer contracts and either renegotiated or terminated contracts that were not profitable

- Increased use of software to reduce administrative staff and purchased programs that tie customer billings to driver pay to ensure correct billing and payments

- Improved collections of outstanding customer bills

- Changed banking institutions to TAB resulting in reduced bank charges

These operational and administrative improvements allowed the Debtors to both streamline and improve their operations, identify and eliminate the weaknesses, and put in place policies and procedures to ensure that the continuous review and improvement continue.

BDDB01 6851331v1

However, as the economy continued its slide into weakness, these steps were not enough and the Debtors undertook a second round of operational restructuring that resulted in a further reduction in fleet size and administrative and operational staff.  In 2011, the Debtors engaged another investment banker, Transport Capital Advisors ("TCA") to seek refinancing, an equity investment, or a sale of the companies.  In addition, the Debtors engaged a contract restructuring advisor, Curt Friedberg of Grisanti, Galef, & Goldress ("GGG") to assist them in this further operational restructuring.  With GGG's assistance, the Debtors fleet reduction and operational savings have resulted in the Debtors recording operational profits in 2011.

## V.    EMERGENCE FINANCING

Unfortunately, TCA was unable to locate a strategic buyer or equity investor for the companies.  However, as the trucking market began to recover, the Debtors found themselves with excess assets that had not only increased in value, but, given that the Debtors had successfully continued to make their payments during the chapter 11 cases had resulted in value above the debt owed to TAB.  David Summitt, using his contacts in the industry, negotiated a sale and sale leaseback of the tractors and trailers currently financed by TAB[3] of the Debtors and the lease of additional tractors with Transport Enterprise Leasing, Inc. ("TEL").  In addition, TEL will provide a new receivables financing to replace the current receivables financing with TAB on same or better conditions.  The term sheet outlining the transaction with TEL ("TEL Transaction" or "Plan Sale") is attached to this Disclosure Statement as **Exhibit 2**.

Under the TEL Transaction, TEL will purchase of all of Debtors' tractors and trailers currently financed by TAB and/or TAL and then leasing back to the Reorganized Debtors certain of the trailers and tractors under triple net leases.  In addition, TEL will lease additional

---

[3]    The Debtors had negotiated an earlier sale of some of the trailers.  That sale is being terminated and Debtors will reimburse the buyer for its inspection costs and the inspection summaries will be provided to TEL.

tractors to the Reorganized Debtors to allow Reorganized Debtors to maintain a fleet of not less than 120 tractors.  Finally, TEL will cause its affiliate Covenant Solutions to enter into a financing agreement to replace TAB as the accounts receivable financer of the Debtors.  The transaction will result in the payoff of TAB and TAL under the Post-Petition Credit Facility, and provide funds to pay administrative and priority claims with some monies remaining to fund operations post emergence.

A more detailed application and use of the proceeds generated from the sale of the tractors and trailers under the Plan is as follows:

| | |
|---|---|
| Sale of 422 trailers | $4,351,500.00 |
| Sale of 74 tractors | $1,300,000.00 |
| Payoff of postpetition TAB overadvance | <$1,000,000.00> |
| Payoff of TAL trailer debt | <$2,300,000.00> |
| Payoff of TAL tractor debt | <$1,300,000.00> |
| Net proceeds | $ |
| | |
| Application of Proceeds | |
| Broker Commission | $   211,000.00 |
| Administrative/Priority Claims[4] | $   450,000.00 |
| Contract Cures (initial payments) | $   190,500.00 |
| Payment to Creditors Trust | $     50,000.00 |
| Operating Funds | $   150,000.00 |

## VI.    CLAIMS ANALYSIS

On May 28, 2009, the Bankruptcy Court entered an order setting June 30, 2009 as the bar date ("Bar Date") for non-governmental creditors to file proofs of claims in these Chapter 11 Cases and August 31, 2009 as the bar date ("Governmental Bar Date") for governmental

---

[4]    This number assumes ordinary course payables to be paid in the ordinary course by Reorganized Debtors.  The customary accounts payable balance for the Debtors averages $1.1 million.  The priority claims do not include the Priority Tax Claims which will be paid over two years.

entities to file proofs of claims in these Chapter 11 Cases.  As of the date of the filing of this Disclosure Statement, 158 proofs of claims had been filed.

On August 27, 2009, the Bankruptcy Court established September 28, 2009 as the bar date for asserting against the Debtors claims entitled to administrative expense priority pursuant to § 503(b)(9) of the Bankruptcy Code ("503(b)(9) Claims").  No valid 503(b)(9) Claims have been filed.

Many of the filed proofs of claim assert Claims against all or more than one of the Debtors and many of the filed proofs of claim are duplicative.  At this time, the Debtors have completed a preliminary review of the Claims filed in these cases. Accordingly, the Debtors reserve the right to dispute or contest the allowance of any and all Claims.[5]  Because certain recoveries under the Plan are directly linked to the amount and value of the Allowed Claims, any change in the Debtors' Claims estimates resulting from further analysis of the proofs of claim filed as of the Bar Date will impact their predictions of recoveries under the Plan.  With this disclaimer, the Debtors believe that distributions to holders of Allowed Claims and Interests will be made in the amounts described below, which is greater than the recoveries and distributions would be in a Chapter 7 Liquidation. (See Liquidation Analysis and Exhibit 3). The estimates below are the best reasonable projection of the distributions that the Debtors can provide at this time, given all the circumstances. These estimates are based on assumptions regarding the ultimate allowance and/or disallowance of Claims and are thus subject to significant change.

| Claims | Projected Gross Claim Amount | Estimated Minimum Distribution |
|---|---|---|
| Administrative Claims | $1,475,086.00 | |
| Priority Claims | $0 | $0 |

---

[5]    If the Plan is confirmed, the claims proposed to the Allowed in the Plan will be Allowed in the amounts listed in the Plan for that class.

| Claims | Projected Gross Claim Amount | Estimated Minimum Distribution |
|---|---|---|
| Priority Tax Claims | $527,482.93 | 100% |
| Class 1 Claim (TAB and TAL) | $7,560,419.00[6] | 100% |
| Class 2 Claim (Leaf Financial) | $14,000.00 | 100% paid in installments |
| Class 3 Claim (NEC Financial) | $100,000.00 | 100% paid in 36 equal installments |
| Class 4 Claim (GE Capital) | $5,574.34 | 100% paid on Distribution Date |
| Class 5 Claim (Plains Capital Leasing) | $470,000.00 | As determined under 506(a) payable over time in equal installments |
| Class 6 Claim (Navistar) | $3,092,535.00 | Unless Reorganized Debtors reach a further agreement, the Navistar tractors will be returned to Navistar and Navistar will have a deficiency Class 9 claim |
| Class 7 Claims (Volvo) | $1,188,000.00 | Unless Reorganized Debtors reach a further agreement, the Volvo tractors will be returned to Volvo and Volvo will have a deficiency Class 9 claim |
| Class 8 Claims (Other Secured Claims) | $0 | Debtors are not aware of any other secured claims |
| Class 9 Claims (Deficiency Claims) | $14,500,000.00 | Classes 9 and 10 will share *pari passu* in the receipts of the Unsecured Creditors' Trust |
| Class 10 Claims (General Unsecured Claims) | $1,100,000.00 | |
| Class 11 Claims (Related Lenders) | $20,920,734.00 | Waived under the Plan |
| Class 12 Claims (Equity Holders) | n/a | Current equity is cancelled under the Plan |

## VII.    PLAN OF REORGANIZATION

### A.    Summary

The Debtors believe that the Plan will allow them to effectively reorganize and

---

[6]    The claims of TAB and TAL have been paid during the course of these Chapter 11 Cases. This amount is the projected total claim owed as of the date of filing of this Disclosure Statement and is subject to further revision and amendment.

BDDB01 6851331v1

continue their businesses in a viable and profitable manner not likely to be followed by the need for further reorganization. The Plan will result in creditors receiving a greater recovery than would be available if the Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code and distributed in accordance with the statutory scheme of priorities contained in the Bankruptcy Code and as set forth in the Liquidation Analysis attached to this Disclosure Statement.

**THE FOLLOWING IS A SUMMARY OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

B.      **Provision For Payment Of Administrative Claims And Priority Claims**

All Allowed Administrative Expense Claims and Allowed Priority Claims (other than Allowed Priority Tax Claims) shall be paid in full by the Debtors on the Effective Date or at such other date as may be agreed to by the holder of the Allowed Administrative Expense Claim or Allowed Priority Claim.  Allowed Priority Tax Claims will be paid by the Debtors with interest accruing at the rate of four percent (4%) in equal cash payments over a period not exceeding five (5) years after the Petition Date, with payments commencing on the later of the Effective Date and the first Business Day that is thirty (30) calendar days after a Priority Tax Claim becomes an Allowed Priority Tax Claim.

C.      **Designation Of Classes Of Claims And Interests**

The Plan designates twelve (12) Classes of Claims or Interests. They are as follows:

1.      "Class 1" consists of the Debtors' obligations to TAB and TAL under the TAB Credit Facilities and the DIP Financing Agreement.

2.      "Class 2" consists of the Secured Claim of Leaf Funding, Inc.

3.     "Class 3" consists of the Secured Claim of NEC Financial Services, Inc.

4.     "Class 4" consists of the Secured Claim of General Electric Capital Corporation.

5.     "Class 5" consists of the Secured Claim of Plains Capital Leasing, LLC.

6.     "Class 6" consists of the Secured Claim of Navistar Financial Corporation.

7.     "Class 7" consists of the Secured Claim of Volvo Financial Services, a division of VFS US, LLC.

8.     "Class 8" consists of Other Secured Claims.

9.     "Class 9" consists of the Deficiency Claims.

10.     "Class 10" consists of General Unsecured Claims.

11.     "Class 11" consists of Claims asserted by Related Lenders.

12.     "Class 12" consists of the Interests of the Equity Holders.

**D.    Treatment Of Classes Impaired Under The Plan**

Claims and Interests will receive the following treatment under the Plan:

1.     **Unclassified Claims**

a.     Allowed Administrative Expense Claims will be paid in full upon the later of (a) the Effective Date of the Plan, (b) the date such claim is Allowed, or (c) such other date as agreed to by the Claimant and the Debtors.

b.     Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, at the sole option of the Debtors, each holder of an Allowed Priority Tax Claim shall receive, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate of 4%, over a period not exceeding five (5) years after the Petition Date, which payments shall begin on the later of the and the first Business Day after the date that is thirty (30) calendar days after the date such

Priority Tax Claims becomes an Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.  The Debtors are not aware of any Priority Claims that are not Priority Tax Claims.

2.    **Classified Claims**

a.    <u>Class 1 Claim (TAB and TAL Secured Claim)</u>.  Class 1 is impaired by this Plan.  In full and complete satisfaction, discharge and release of the Class 1 Claim, the holder of the Allowed Class 1 Claim will be paid in part from the proceeds of the completion of the TEL Transaction that will sell the tractor and trailer collateral of TAB and TAL free and clear of all liens, claims and encumbrances with all such liens and claims attaching to the proceeds. In addition, TAB will be allowed to collect out the accounts receivable under the accounts receivable financing with any additional collections being returned to the Reorganized Debtors on or before the Distribution Date.

b.    <u>Class 2 Claim (Leaf Funding, Inc. Claim)</u>.  Class 2 is impaired by this Plan.  In full and complete satisfaction, discharge and release of the Class 2 Claim, the Class 2 Claim shall be allowed in the amount as determined under § 506(a) of the Bankruptcy Code and the holder of the Allowed Class 2 Claim shall receive, at the option of the Debtors, either (i) one hundred percent (100%) of the Allowed Class 2 Claim, plus 4 % interest, in equal monthly installments of principal and interest over the remaining term of the  Debtors' agreements with such holder, (ii) the proceeds of the sale or disposition of the collateral securing the Allowed Class 2 Claim to the extent of the value of the holder's secured interest in such collateral, net of the costs of disposition of such collateral, (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code, including the surrender of any such collateral; or (iv) such other treatment as the Debtors and the holder of the Class 2 Claim may agree.  The holder of the

Allowed Class 2 Claim shall continue to retain any liens on the collateral which secured the Class 2 Claim on the Petition Date to the extent said collateral has not been sold or otherwise liquidated prior to the date of the Confirmation Order.

        c.     Class 3 Claims (NEC Financial Services, L.L.C. Secured Claim). Class 3 is impaired by this Plan.  In full and complete satisfaction, discharge and release of the Class 3 Claim, the Class 3 Claim shall be Allowed in the amount of $100,000 and the holder of the Allowed Class 3 Claim shall receive, at the option of the Debtors, (i) one hundred percent (100%) of the Allowed Class 3 Claim, plus 4% interest, in equal monthly installments of principal and interest over three years with payments beginning on the Distribution Date, (ii) the proceeds of the sale or disposition of the collateral securing the Allowed Class 3 Claim to the extent of the value of the holder's secured interest in such collateral, net of the costs of disposition of such collateral, (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code, including the surrender of any such collateral; or (iv) such other treatment as the Debtors and the holder of the Class 3 Claim may agree.  The holder of the Allowed Class 3 Claim shall continue to retain any liens on the collateral which secured the Class 3 Claim on the Petition Date to the extent said collateral has not been sold or otherwise liquidated prior to the date of the Confirmation Order.

        d.     Class 4 Claim (General Electric Capital Corporation Secured Claim). Class 4 is not impaired by this Plan.  The Class 4 Claim will be Allowed in the amount of $5,574.34 and in full and complete satisfaction, discharge and release of the Class 4 Claim, the holder of the Class 4 Claim will receive 100% of the Allowed Class Four Claim in Cash on the Distribution Date and will retain its liens until paid in full.

- 17 -

e.  <u>Class 5 Claim (Plains Capital Leasing, LLC Secured Claim)</u>.  Class
5 is impaired by this Plan.  The Class 5 Claim shall be Allowed in the amount as determined
under §506(a) of the Bankruptcy Code and in full and complete satisfaction, discharge and
release of the Class 5 Claim, the holder of the Allowed Class 5 Claim shall receive, at the option
of the Debtors, either (i) one hundred percent (100%) of the Allowed Class 5 Claim, plus
interest, in equal monthly installments of principal and interest over the remaining term of the
Debtors' agreements with such holder (adjusting the maturity date for the time during the
Chapter 11 Cases), (ii) the proceeds of the sale or disposition of the collateral securing the
Allowed Class 5 Claim to the extent of the value of the holder's secured interest in such
collateral, net of the costs of disposition of such collateral, (iii) such other distribution as
necessary to satisfy the requirements of the Bankruptcy Code, including the surrender of any
such collateral; or (iv) such other treatment as the Debtors and the holder of the Class 5 Claim
may agree.  The holder of the Allowed Class 5 Claim shall continue to retain any liens on the
collateral which secured the Class 5 Claim on the Petition Date to the extent said collateral has
not been sold or otherwise liquidated prior to the date of the Confirmation Order.

f.  <u>Class 6 Claim (Navistar Financial Corporation Secured Claim)</u>.
Class 6 is impaired by this Plan.  In full and complete satisfaction, discharge and release of the
Class 6 Claim, the holder of the Allowed Class 6 Claim shall receive, at the option of the
Debtors, either (i) one hundred percent (100%) of the Allowed Class 6 Claim, plus interest, in
equal monthly installments of principal and interest over the remaining term of the  Debtors'
agreements with such holder, (ii) the proceeds of the sale or disposition of the collateral securing
the Allowed Class 6 Claim to the extent of the value of the holder's secured interest in such
collateral, net of the costs of disposition of such collateral, (iii) such other distribution as

- 18 -

necessary to satisfy the requirements of the Bankruptcy Code, including the surrender of any such collateral; or (iv) such other treatment as the Debtors and the holder of the Class 6 Claim may agree.  The holder of the Allowed Class 6 Claim shall continue to retain any liens on the collateral which secured the Class 6 Claim on the Petition Date to the extent said collateral has not been sold or otherwise liquidated prior to the date of the Confirmation Order.

        g.        <u>Class 7 Claim (Volvo Financial Services Secured Claim)</u>.  Class 7 is impaired by this Plan.  In full and complete satisfaction, discharge and release of the Class 8 Claim, the holder of the Allowed Class 7 Claim shall receive, at the option of the Debtors, either (i) one hundred percent (100%) of the Allowed Class 7 Claim, plus interest, in equal monthly installments of principal and interest over the remaining term of the  Debtors' agreements with such holder, (ii) the proceeds of the sale or disposition of the collateral securing the Allowed Class 7 Claim to the extent of the value of the holder's secured interest in such collateral, net of the costs of disposition of such collateral, (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code, including the surrender of any such collateral; or (iv) such other treatment as the Debtors and the holder of the Class 8 Claim may agree.  The holder of the Allowed Class 7 Claim shall continue to retain any liens on the collateral which secured the Class 7 Claim on the Petition Date to the extent said collateral has not been sold or otherwise liquidated prior to the date of the Confirmation Order.

        h.        <u>Class 8 Claim (Other Secured Claims)</u>.  Class 8 is impaired by this Plan.  In full and complete satisfaction, discharge and release of the Class 8 Claims, each holder of an Allowed Class 8 Claim shall receive, at the option of the Debtors, either (i) one hundred percent (100%) of the Allowed Class 8 Claim, plus interest, in equal monthly installments of principal and interest over the remaining term of the  Debtors' agreements with such holder, (ii)

the proceeds of the sale or disposition of the collateral securing the Allowed Class 8 Claim to the extent of the value of the holder's secured interest in such collateral, net of the costs of disposition of such collateral, (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code, including the surrender of any such collateral; or (iv) such other treatment as the Debtors and the holder of the Class 8 Claim may agree.  Each holder of an Allowed Class 8 Claim shall continue to retain any liens on the collateral which secured the Class 8 Claim on the Petition Date to the extent said collateral has not been sold or otherwise liquidated prior to the date of the Confirmation Order.

        i.      <u>Class 9 (Deficiency Claims)</u>.  Class 9 is impaired by this Plan. Holders of Allowed Class 9 Claims shall share pari passu with holders of Allowed Class 10 Claims in a Pro Rata share of the beneficial interest in the Creditors' Trust and shall receive its Pro Rata share of periodic distributions from the Creditors' Trust Account.

        j.      <u>Class 10 (General Unsecured Claims)</u>.  Class 10 is impaired by this Plan.  In full and complete satisfaction, discharge and release of the Class 10 Claims, each holder of an Allowed Class 10 Claim shall share pari passu with the holders of Allowed Class 9 Claims and receive its Pro Rata share of the beneficial interest in the Creditors' Trust and shall receive its Pro Rata share of the periodic distributions from the Creditors' Trust Account.

        k.      <u>Class 11 (Related Lenders Claims)</u>.  Class 11 is impaired by this Plan.  Holders of Class 11 Claims shall not receive a beneficial interest in the Creditors' Trust and shall not share in any distributions from the Creditor's Trust Account. In return for subordination of the Class 11 Claims to the Class 9 and Class 10 Claims, holders of Allowed Class 11 Claims shall receive a full release of any and all Causes of Action including any Avoidance Actions or causes of action under the Bankruptcy Code that the Debtors, the

Reorganized Debtors or the Estates may possess against such holders of Class 11 Claims. The schedule of Related Lenders shall be contained in the Plan Supplement. The Claim of any Person for amounts loaned the Debtors prior to the Petition Date who is not listed on the Schedule of Related Lenders will not be treated as a Class 11 Claim.

        l.      <u>Class 12 (Equity Interests)</u>.  Class 12 is impaired by this Plan.  The equity interests in the Debtors will be cancelled on the Effective Date and issued by the Reorganized Debtors to David L. Summitt and Jesse Ballew in consideration of the New Equity Contribution paid to the Creditors' Trust.

        **E.**      <u>**Means for Implementation And Execution Of The Plan**</u>

        The Effective Date of the Plan will occur on the later of (1) eleven (11) days after the entry of a final order confirming the Plan and (2) the date on which all conditions to the Effective Date have occurred or been waived. The Plan will be funded by the proceeds of the Plan Sale (TEL Transaction), cash flow from the ongoing business operations of the Debtors, and the New Equity Contribution.

        1.      <u>Distributions to Holders of Allowed Class 9 and 10 Claims</u>

        On the Effective Date, the Creditors' Trust will be created for the purpose of facilitating distributions to holders of Allowed Class 9 and 10 Claims. Payments to the holders of Allowed Class 9 and 10 Claims will be made by periodic distributions from the Creditors' Trust Account. The Creditors' Trust Account will be initially funded by the New Equity Contribution and $50,000 in cash from the operating funds of the Reorganized Debtors.  It will continue to be funded by the assigned Avoidance Actions that have not been waived or released or otherwise settled under this Plan or orders of the Court.

        All proceeds of the assigned Avoidance Actions shall be paid to the Creditors' Trust Account for distributions to holders of Allowed Class 9 and 10  Claims.  Pursuant to 11

U.S.C. 1123(b)(3)(B), the Creditors' Trustee, as the representative of the Estates, shall prosecute the assigned Avoidance Actions.  In the event the Creditors' Trustee is unable or unwilling to prosecute any Avoidance Action, the Reorganized Debtors, in their sole discretion, may prosecute such Avoidance Action at the Creditors' Trustee's request, for the benefit of the Creditors' Trust.  On and after the Effective Date, the Creditors' Trustee and the Reorganized Debtors shall have the authority and ability to prosecute, settle and/or abandon any Avoidance Action initiated by them without the approval or order of the Bankruptcy Court.

All proceeds of the Avoidance Actions, net of payment of all costs and expenses, including fees and expenses of professionals retained by the Creditors' Trust in connection with the prosecution of such claims, shall be paid to the Creditors' Trust Account and shall be used exclusively to fund the payments of the holders of Allowed Class 9 and 10  Claims on account of such Claims and the fees and expenses of the Creditors' Trustee.  All fees and expenses of prosecuting the Avoidance Actions and administering the Creditors' Trust shall be charged to the Creditors' Trust.  Under no circumstances will the Debtors' estates or the Reorganized Debtors be charged with or be responsible for any fees and expenses related to the Creditors' Trust.

2.    **Delivery of Distributions and Undeliverable Distributions**

Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address set forth on the Proofs of Claim filed by such holders or other writing notifying the Creditors' Trustee or the Reorganized Debtors of a change of address. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Creditors' Trustee or the Reorganized Debtors are notified of such holder's then current address. All claims for undeliverable distributions shall be made on or before ninety (90) days after the date of such undeliverable distribution was initially made.  Failure to provide

- 22 -

a new address within the 90 day period shall result in no further distributions and the Allowed Claim shall be deemed satisfied in full.

If the Allowed Claim that is removed from further distributions is being paid pursuant to a Pro Rata distribution formula, the Pro Rata distribution shall be recalculated annually (in January of each calendar year) to account for any such reduction in the total of Allowed Claims going forward.

3.     **Time Bar to Cash Payments**

Checks issued by the Reorganized Debtors or the Creditors' Trust in respect of Allowed Claims, other than Classes 9 or 10 Claims, shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Reorganized Debtors or the Creditors' Trustee, as applicable, by the holder of the Allowed Claim, to whom such check was originally issued. Any request in respect of such a voided check shall be made on or before the expiration of the ninety (90) day period following the date of issuance of such check.

If the Allowed Claim that is removed from further distributions is being paid pursuant to a Pro Rata distribution formula, the Pro Rata distribution shall be recalculated annually (in January of each calendar year) to account for any such reduction in the total of Allowed Claims going forward.

4.     **Professional Fees and Administrative Expense Claims**

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, the holders of Allowed Administrative Expense Claims shall receive in full and complete settlement, satisfaction and discharge of its Allowed Administrative Expense Claim, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim on the later of the (a) the Effective Date, (b) the date on which said entity becomes a

- 23 -

holder of such Allowed Administrative Expense Claim, or (c) such date as such entity may agree to with the Debtors, provided however, that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors as debtors in possession, or liabilities arising under other obligations incurred by the Debtors as debtors in possession, whether or not incurred in the ordinary course of business, shall be paid by the Reorganized Debtors in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such transactions. Notwithstanding § 503(a) of the Bankruptcy Code, any person seeking payment of an asserted Administrative Expense Claim under § 503 of the Bankruptcy Code, other than a professional person or a governmental unit seeking payment of an expense under § 503(b)(1)(B) or (C), that was incurred on or before the Effective Date but which has not been paid by the Debtors, shall be required to file an application for the allowance of final payment of said claim on or before the Administrative Claims Bar Date, and any such claim not filed by the Administrative Claims Bar Date shall be forever barred and discharged. Objections to any such application shall be filed within sixty (60) days after the Effective Date.  Notwithstanding § 503(a) of the Bankruptcy Code, each Professional Person or firm retained with approval by order of the Bankruptcy Court or requesting compensation in the Chapter 11 Cases pursuant to §§ 327, 328, 330, or 1103, of the Bankruptcy Code, or any person seeking payment of an asserted Administrative Expense Claim under  § 503 of the Bankruptcy Code, shall be required to file an application for the allowance of final compensation, reimbursement of expenses, or for payment of any Administrative Expense Claim in the Chapter 11 Cases incurred through the Effective Date on or before sixty (60) days after the Effective Date and any such claim not filed by that date shall be forever barred and discharged. Objections to any such application shall be filed within twenty (20) days after such

- 24 -

application is filed.  The Reorganized Debtors shall pay all Allowed Administrative Expense
Claims.

        5.      **Transactions on Business Days**

        If the Effective Date or any other date on which a transaction may occur under the
Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to
occur on such day shall instead occur on the next succeeding Business Day.

        F.      **Procedures For Resolving And Treating Disputed Claims And Interests**

        1.      **Consolidation of Debtors**

        For purposes of the Plan and administration of the Chapter 11 Cases, including
assessment and payment of fees to the US Trustee, the Debtors' Plan provides that the Chapter 11
Cases and estates of the Debtors will be substantively consolidated into a single chapter 11 case
and single estate. All property of each individual Debtor's Estate will be deemed to be the
property of the consolidated Estates.  All Claims against a Debtor and its Estate will be deemed
to be a Claim against the consolidated Debtors, any proof of Claim filed against one or more of
the Debtors will be deemed to be a single Claim filed against the consolidated Estates, and all
duplicate proofs of Claim for the same Claim filed against more than one Debtor will be deemed
expunged.  Due to the substantive consolidation of the Debtors and their Estates for distributions
under the Plan and purposes of administration of the Chapter 11 Cases and assessment of fees,
all Claims by a Debtor against another Debtor will be waived and expunged.  Furthermore,
except as otherwise provided in the Plan, any Claim based upon prepetition unsecured guaranties
by one Debtor in favor of one or more Debtors or other basis of co-Debtor liability will be
eliminated, and no distributions under the Plan will be made on account of such Claims based
upon such guaranties or other basis of co-Debtor liability.

BDDB01 6851331v1

For the purposes of any setoff authorized under § 553 of the Bankruptcy Code, the Debtors will be treated as one consolidated Entity so that, subject to the other provisions and requirements of § 553 of the Bankruptcy Code, prepetition debts owed to any of the Debtors may be setoff against the prepetition debts of any other of the Debtors.

Notwithstanding anything in the Plan, the Reorganized Debtors shall maintain their separate legal forms and identities and the consolidation of the Estates for purposes of the Plan, distribution, the assessment of fees, and requesting final decrees and closing the Chapter 11 Cases shall not be construed or used as evidence of the liability of any Reorganized Debtor for the debts or liabilities of any other Reorganized Debtor on and after the Effective Date.

Although not specifically addressed in the Bankruptcy Code or the Bankruptcy Rules, substantive consolidation is authorized under §§ 105(a) and 1123(a)(C) of the Bankruptcy Code. The Seventh Circuit Court of Appeals has not delineated a test for substantive consolidation. However, substantive consolidation analysis has evolved into three general camps. The first camp is that which applies a list of factors similar to those employed in *In re Vecco Constr. Indus., Inc.,* 4. B.R. 407 (Bankr. E.D. Va. 1980), which highlights seven factors: (1) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (2) presence or absence of consolidated financial statements; (3) profitability of consolidation at a single physical location; (4) commingling of assets and business functions; (5) unity of interests and ownership among the companies to be consolidated; (6) existence of parent and inter-corporate guaranties on loans; and (7) the transfer of assets without formal observance of corporate formalities. *Id.* at 410. Most of the *Vecco* factors are present here. The Debtors function as a single unit in conducting their business and share a central single administrative staff, management and location. The Debtors compile consolidated financial statements and are

all owned by the same entity. Most of the secured debt of the Debtors is guaranteed by all the Debtors notwithstanding that ownership of any particular asset may be lodged in one of the Debtors. The owners of the entity that owns the Debtors also personally guaranteed all of the secured debt. Under the *Vecco* test, substantive consolidation is warranted.

      The next principal test for substantive consolidation is found *In re Augie/Restivo Baking Co.,* 860 F.2d 515 (2d Cir. 1988) and its progeny, which have boiled the analysis down to two factors: (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the businesses of the debtors were so entangled that consolidation would benefit all creditors. *Id.* at 518. Both of these factors are present in these Chapter 11 Cases. TAB, the Debtors' prepetition and postpetition lender and exit financier, relied on the credit of more than one Debtor in extending credit facilities to the Debtors' businesses. Furthermore, most lessors/secured creditors required inter-company guaranties of equipment agreements before agreeing to provide the Debtors with tractors and trailers. More telling, the pooled assets of the Debtors have always been used to pay the obligations of each Debtor irrespective of which Debtor incurred the obligation. It would be extremely difficult, if possible at all, to unwind these transactions on a Debtor-by-Debtor basis. These facts support substantive consolidation under the *Augie/Restivo* analysis.

      The third analysis stems from *In re Auto-train Corp.*, 810 F.2d 270 (D.C. Cir. 1987) and *In re Eastgroup Props.,* 935 F.2d 245 (11th Cir. 1991). These two Circuits have also adopted a two-factor test which focuses on factors slightly different than those considered by the Second Circuit in *Augie/Restivo*: (1) whether there is substantial identity between the entities to be consolidated; and (2) whether consolidation is necessary to avoid some harm or to realize some benefit. *In re Auto-train Corp.*, 810 F.2d at 276; *In re Eastgroup Props.,* 935 F.2d at 249.

- 27 -

As noted under the Vecco analysis, there is substantial identity among the Debtors. Substantive consolidation provides a benefit in these Chapter 11 Cases for several reasons: a) intercompany debts are eliminated, thereby increasing the funds available to unsecured non-priority creditors; and (b) the revenue of all Debtors can be used to enable the Debtors to pay the senior lender and allow other funds to be available for payment to general unsecured creditors.

Based on the foregoing, substantive consolidation is appropriate and justified in these Chapter 11 Cases. The chief concern regarding substantive consolidation (that it may affect creditor recovery because it combines the assets and liabilities of entities that may have different debt-to-asset rations), if applicable at all to these Debtors, is far outweighed by the benefits of substantive consolidation.

2.    **No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, no cash or other property shall be distributed under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim or Interest.

3.    **Resolution of Disputed Claims or Interests**

On the Effective Date, the Reorganized Debtors, with the assistance of the Creditors' Trustee, shall have the right, duty and obligation to review the Debtors' Schedules and any Claims or Interests filed in these Chapter 11 Cases and to object to any such Claims or Interests, if the Reorganized Debtors, in consultation with the Creditors' Trust, believe that there is an appropriate basis to object to such Claims. Subject to further extension by the Bankruptcy Court, the Reorganized Debtors, with the assistance of the Creditors' Trustee, shall be required to file such objections to Claims or Interests on or before the Claim Objection Deadline. The Creditors' Trustee shall have standing only to pursue and settle any unresolved objections to Class 9 and 10 Claims, and to object to any Class 9 and 10 Claims to which the Reorganized

- 28 -

Debtors do not file objections, on or before the Claims Objection Deadline.  All objections shall be litigated to a Final Order except to the extent the Reorganized Debtors or the Creditors' Trustee elect to withdraw any such objection, or elect to compromise, settle, or otherwise resolve any such objection, in which event the Reorganized Debtors or the Creditors' Trustee may settle, compromise, or otherwise resolve the objections to such Disputed Claims without the approval or order of the Bankruptcy Court, provided the Effective Date has occurred.

4.      **Estimation**

The Debtors, the Reorganized Debtors or the Creditors' Trustee may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to § 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Creditors' Trustee have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claims, the Debtors, the Reorganized Debtors, or the Creditors Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claim objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims which have been estimated subsequently may be compromised, settled, withdrawn or otherwise resolved by the Debtors, the Reorganized Debtors or the Creditors' Trustee without approval by the Bankruptcy Court.

G.      **Treatment Of Executory Contracts And Unexpired Leases**

1.      **Rejection of Executory Contracts and Unexpired Leases**

- 29 -

On the Confirmation Date, but subject to the occurrence of the Effective Date, pursuant to § 365 of the Bankruptcy Code, all of the Debtors' executory contracts and unexpired leases shall be deemed rejected except those that: (i) are the subject of motions to assume or reject pending on the Confirmation Date; (ii) were assumed or rejected before the Confirmation Date; or (iii) are designated specifically as a contract or lease to be assumed on the Schedule of Assumed Contracts and Leases contained in the Plan Supplement (which Schedule of Assumed Contracts and Leases shall be served upon the non-Debtor parties to the Assumed Contracts and Leases), as such Schedule of Assumed Contracts and Leases may be amended on written notice to affected parties from time to time prior to the Confirmation Date to delete unexpired leases or executory contracts therefrom or to add additional contracts and leases thereto.

2.    **Approval of Rejection of Executory Contracts and Unexpired Leases**

Entry of the Confirmation Order shall constitute the rejection, pursuant to § 365(a) of the Bankruptcy Code, of the executory contracts and unexpired leases rejected.

3.    **Effect of Post-Confirmation Rejection**

The entry by the Bankruptcy Court after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease shall result in such rejection being a prepetition breach under §§ 365(g) and 502(g) of the Bankruptcy Code.

4.    **Deadline to File Rejection Damage Claims**

Each Person who is a party to a contract or lease rejected under the Plan must file with the Bankruptcy Court and serve on the Debtors' or Reorganized Debtors' attorneys, not later than twenty (20) days after later of (a) the Confirmation Date, or (b) the rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults, a proof of claim for damages alleged to arise from the rejection of the applicable contract or lease or be forever

- 30 -

barred from filing a Claim, or sharing in distributions under the Plan, related to such alleged rejection damages.

        5.      **Assumption of Executory Contracts and Unexpired Leases**

Annexed to the Plan Supplement is the Schedule of Assumed Contracts and Leases deemed to be assumed by the Debtors under the Plan as of the Confirmation Date (but subject to the occurrence of the Effective Date) pursuant to § 365 of the Bankruptcy Code, the cure amounts necessary for such assumptions, and the proposed payment terms for such cure amounts.

        6.      **Approval of Assumption of Executory Contracts and Unexpired Leases**

Subject to the cure and rejection procedures set forth in the Plan, entry of the Confirmation Order shall constitute assumption pursuant to § 365(a) of the Bankruptcy Code, of the executory contracts and unexpired leases listed on the Schedule of Assumed Contracts and Leases.

        7.      **Cure Procedures**

At the election of the Reorganized Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to  § 365(b)(1) of the Bankruptcy Code, (a) pursuant to the payment terms set forth on the Schedule of Assumed Contracts and Leases, or (b) on such other terms as may be agreed to by the parties to such executory contract or unexpired lease and the Reorganized Debtors. If a dispute occurs regarding: (i) the cure amount; (ii) the payment terms for such cure amounts; (iii) the ability of the Debtors to provide adequate assurance of future performance under the contract or lease to be assumed; or (iv) any other matter pertaining to assumption, then the cure payments

required by § 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption.

8.    **Deadline to Object to Cure Amounts**

Any party to an executory contract or unexpired lease listed on the Schedule of Assumed Contracts and Leases that disputes (i) the cure amount; (ii) the payment terms for such cure amounts; (iii) the ability of the Debtors and the Reorganized Debtors to provide adequate assurance of future performance under the contract or lease to be assumed; or (iv) any other matter pertaining to assumption, must file with the Bankruptcy Court and serve upon the attorneys for the Debtors, a response in writing specifically stating the nature of the objection and all facts that support such objection on or before three (3) days before the hearing on confirmation of the Plan.  In the event a party to such an executory contract or unexpired lease fails to file with the Bankruptcy Court an objection to the applicable cure amount and payment terms for such cure amounts set forth on the Schedule of Assumed Contracts and Leases, by the above deadline, then such party shall be forever barred from asserting any additional or other amounts against the Debtors respecting such cure amount.

9.    **Amendment of the Schedule of Assumed Contracts**

The Debtors reserve their right, at any time prior to the Confirmation Date and on written notice to affected parties, to amend the Schedule of Assumed Contracts and Leases prior to the Confirmation Date to delete unexpired leases or executory contracts therefrom or to add additional contracts and agreements thereto, and to alter the amounts and terms of cure payments.

H.    **Effect Of Confirmation**

1.    **Revesting of Assets**

- 32 -

Except as otherwise provided in the Plan, upon the Effective Date, the Debtors' assets will revest in the Reorganized Debtors free and clear of all claims and interests.

2.    **Binding Effect**

Except as otherwise provided in § 1141 (d)(3) of the Bankruptcy Code, after confirmation, the provisions of the Plan shall bind any holder of a Claim against, or Interests in, the Debtors and their respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

3.    **Discharge**

Except as otherwise provided in the Plan or the Confirmation Order, effective on the Confirmation Date, the Plan shall discharge and terminate all liability for any debt of, or Claim against, the Debtors that arose before the Effective Date, and any debt or claim of a kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not:

(a)    a proof of claim based on such debt or Claim was filed, or deemed filed, under § 501 of the Bankruptcy Code;

(b)    such Claims are Allowed or Disallowed under § 502 of the Bankruptcy Code;

(c)    such Claim was properly scheduled, if such claim holder had notice of these Chapter 11 Cases before the Confirmation Date; or

(d)    the holder of such Claim has accepted or rejected the Plan.

4.    **Exculpation**

The Debtors, the Committee and TAB [if the Plan is supported]  and their respective officers, directors, managers, members, shareholders, employees, agents, and professionals shall neither have nor incur any liability to any person or entity for any prepetition or post petition act take, or omitted to be taken, in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or

BDDB01 6851331v1

consummating the Plan, the Disclosure Statement, or any contract, instrument, release or any other agreement or document created, or entered into, in connection with the Plan, or any other prepetition or post petition act taken, or omitted to be taken, in connection with, or in contemplation of the Debtors' restructuring of the Chapter 11 cases.

**I.**      <u>**Retention of Jurisdiction**</u>

     1.      <u>**Exclusive Jurisdiction of Bankruptcy Court**</u>

     The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, §§ 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

     (a)      To hear and determine any motions for the assumption or rejection of executory contracts or unexpired leases, and the allowance of any Rejection Claims resulting therefrom;

     (b)      To determine any and all pending adversary proceedings, applications, and contested matters;

     (c)      To hear and determine any objection to any Claims;

     (d)      To enter and implement such orders as may be appropriate in the event the confirmation order is for any reason stayed, revoked, modified, or vacated;

     (e)      To issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code;

     (f)      To consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

     (g)      To hear and determine all applications for compensation and reimbursement of expenses of professionals under §§ 330, 331, and 503(b) of the Bankruptcy Code;

     (h)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan;

(i)    To recover all assets of the Debtors and property of the Estates, wherever located;

(j)    To hear and determine matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under § 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all taxable periods ending after the Petition Date through, and including, the entry of final decrees closing the Chapter 11 Cases);

(k)    To hear any other matter consistent with the provisions of the Bankruptcy Code; and

(l)    To enter final decrees closing the Chapter 11 Cases.

**J.    Acceptance Or Rejection Of This Plan**

1.    **Voting of Claims**

Each holder of an Allowed Claim or Interest in an impaired Class of Claims or Interests shall be entitled to vote to accept or reject the Plan.  All Classes other than Class 4 are impaired under the Plan.  Classes 12 is deemed to reject the Plan.

2.    **Acceptance by a Class of Creditors**

Consistent with § 1126(c) of the Bankruptcy Code and except as provided for in § 1126(e) of the Bankruptcy Code, a Class of creditors shall have accepted the Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the holders of Allowed Claims or Interests of such Class that have timely and properly voted to accept or reject the Plan.

3.    **Acceptance by a Class of Interests**

Consistent with § 1126(d) of the Bankruptcy Code and except as provided for in § 1126(e) of the Bankruptcy Code, a Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds in amount of the holders of Allowed Interests of such Class that have timely and properly voted to accept or reject the Plan.

4.    **Confirmation Over the Rejection of the Plan by an Impaired Class.**

The Debtors intend to seek confirmation of the Plan over the objection of any impaired Class pursuant to § 1129(b) of the Bankruptcy Code.

### K.    Miscellaneous Provisions

#### 1.    The Plan Supplement

The Debtors will file and serve a notice of filing of a supplemental appendix to the Plan at least twenty (20) days prior to the hearing on confirmation of this Plan. The Plan Supplement will contain the following documents, in substantially the form to be entered into in connection with the implementation of the Plan: (i) the Creditors' Trust Agreement; (ii) Schedule of Assumed Contracts and Leases; and (iii) the Schedule of Related Lenders; and (iv) such other documents as may be necessary or appropriate to implement the terms and provisions of the Plan. After it has been filed, you may obtain a copy of the Plan Supplement by written request to the Debtors' counsel. ***All Plan documents will be subject to revision and modification prior to the Effective Date. This may result in material changes to the terms of the Plan documents.*** If modifications to the Plan documents are made by the Debtors prior to the occurrence of the Effective Date (A) the Debtors shall provide copies of the modified documents to counsel to the Committee within one Business Day of their completion and (B) the Debtors shall seek Bankruptcy Court approval of such modifications if and to the extent required by § 1127 of the Bankruptcy Code.

#### 2.    Effectuating Documents and Further Transactions

The Debtors and Reorganized Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases and other agreements or documents and take such actions on behalf of the Debtors or Reorganized Debtors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, without any further action by or approval of the governing members or managers of the Debtors. Any transfer from the

- 36 -

Debtors pursuant to the Plan will not be taxed under any law imposing a stamp tax or similar tax pursuant to § 1146(c) of the Bankruptcy Code.

        3.      **Payment of Statutory Fees**

      All fees payable pursuant to Chapter 123 of Title 28, United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date. All post-confirmation statutory fees assessed on and after the Effective Date shall be assessed based on the disbursements of the Debtors' consolidated Estates, including the Creditors' Trust, and not on the Reorganized Debtors' operations.  All such fees, as assessed on the consolidated Debtors' Estates, shall be paid by the Creditors' Trustee from the Creditors' Trust until the Chapter 11 Cases are closed.

        4.      **Modification of Plan**

      The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with § 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of an Allowed Claim or Interest that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

        5.      **Withdrawal or Revocation**

      The Debtors may withdraw or revoke the Plan at any time prior to the Effective Date. If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Effective Date does not occur, then the Plan shall be deemed null and void. In such event, nothing

contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

## VIII.  LIQUIDATION ANALYSIS UNDER CHAPTER 7

Unsecured creditors would receive no distribution if the Debtors' assets were to be liquidated under a chapter 7 liquidation. The Debtors' assets consist primarily of accounts receivable that are pledged to TAB as well as equipment. In the event of a liquidation under chapter 7, TAB would liquidate the accounts receivable. In a liquidation, the Debtors would cease operations which would likely reduce the collectability of the outstanding accounts receivable. The Debtors' equipment is also subject to the liens of equipment financers and TAB. The value of the equipment, consisting primarily of used tractors and trailers, would likely be significantly diminished in a chapter 7 liquidation. The Debtors submit that after payment of Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed Secured Claims, there would be no proceeds from the liquidation of assets not pledged to secured lenders, to pay unsecured claims. A liquidation analysis prepared by the Debtors' management, is attached to this Disclosure Statement as **Exhibit 3**.

## IX.    LITIGATION DURING THE CHAPTER 11 CASE

The Debtors have not been involved in significant litigation during the administration of their Chapter 11 Cases. The litigation that has taken place has been in the nature of addressing motions for assumption and rejection of certain equipment leases and certain motions for relief from the automatic stay filed by certain secured creditors.

## X.     FEASIBILITY

The Debtors have used the respite granted by the Chapter 11 Cases to restructure their businesses. As set forth above, the Debtors have taken significant steps to increase the

profitability of their businesses, including reducing operational overhead and restructuring their debt facilities. The Debtors' good operations during the Chapter 11 Cases has resulted in value in certain assets, the sale of which, can be used to fund the administrative and contract cure claims of the Debtors and allow them to exit. The Debtors believe that they will be able to consummate all terms and conditions of the Plan and, therefore, that the Plan is feasible. The Debtors have prepared projections based upon the performance of their businesses in their restructured form. These projections show that the Debtors should have the income necessary to, at a minimum, make the required payments to creditors and to operate successfully. A copy of the Debtors' projections is attached hereto as **Exhibit 4**.

A.   **Management.**

There will be no material changes in management of the Reorganized Debtors. The majority of the Debtors' key managers will remain in place in the same positions they currently hold; however, certain of the Debtors' managers may change their titles or positions within the Debtors.  David L. Summitt will continue to manage the Reorganized Debtors.

**XI.   AVOIDANCE ACTIONS**

Avoidance Actions are actions taken under §§ 544-553 of the Bankruptcy Code to set aside and recover certain transfers of the Debtors' property that were made before the Petition Date. The Debtors have only performed a cursory analysis of the Avoidance Actions at this time. In doing their analysis, the Debtors have not considered such issues as ordinary course of payment and new value defenses. Accordingly, the prosecution of Avoidance Actions <u>may, or may not</u> result in additional distributions to holders of Allowed Class 9 and 10 Claims. As earlier described, all proceeds of the Avoidance Actions, net of payment of all costs and expenses, including fees and expenses of professionals retained in connection with the prosecution of such claims, shall be paid to the Creditors' Trust for distribution to holders of Allowed Class 9 and 10

- 39 -

Claims. The Creditors' Trustee shall prosecute the Avoidance Actions. In the event the

Creditors' Trustee is unable to prosecute any Avoidance Action, the Debtors, in their sole

discretion,  may prosecute such Avoidance Action at the Creditors' Trustee's request. The

Creditors' Trustee and the Debtors shall have the authority and ability to prosecute, settle and/or

abandon any Avoidance Action initiated by them without the approval or order of the

Bankruptcy Court.

## XII.   TAX CONSEQUENCES

**THE FEDERAL, STATE, LOCAL AND OTHER GENERAL TAX
CONSEQUENCES AS A RESULT OF THE PLAN TO THE HOLDERS OF CLAIMS
MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH
HOLDER. THEREFORE, EACH CREDITOR SHOULD CONSULT THEIR OWN TAX
ADVISOR TO DETERMINE THE TREATMENT AFFORDED THEIR RESPECTIVE
CLAIMS BY THE PLAN UNDER FEDERAL TAX LAW, THE TAX LAW OF THE
VARIOUS STATES AND LOCAL JURISDICTIONS OF THE UNITED STATES AND
THE LAWS OF FOREIGN JURISDICTIONS.**

**NO STATEMENT IN THIS DISCLOSURE STATEMENT SHOULD BE
CONSTRUED AS LEGAL OR TAX ADVICE. THE DEBTORS AND THEIR COUNSEL
DO NOT ASSUME ANY RESPONSIBILITY OR LIABILITY FOR THE TAX
CONSEQUENCES A CREDITOR MAY INCUR AS A RESULT OF THE TREATMENT
AFFORDED THEIR CLAIM UNDER THE PLAN.**

## XIII.   CRAM DOWN

Section 1129(b) of the Bankruptcy Code permits the Bankruptcy Court to approve

the Plan even if one or more classes of impaired claims or interests do not accept the Plan. This

is referred to as a cram down. Under § 1129(b) of the Bankruptcy Code, the Bankruptcy Court

BDDB01 6851331v1

may confirm the Plan only if it finds that certain circumstances exist. First, the Plan must be accepted by at least one impaired class and must not discriminate unfairly against, and be fair and equitable to, all non-accepting impaired classes. Second, unless all members of a non-accepting, impaired class receive payment in full of their Allowed Claims, no class that is junior in priority to the non-accepting impaired class may receive anything under the Plan. IF ANY CLASS REJECTS THE PLAN, THE DEBTORS WILL SEEK TO CONFIRM THE PLAN PURSUANT TO THE CRAM DOWN METHOD PROVIDED BY § 1129(b) OF THE BANKRUPTCY CODE.  THE TREATMENT AFFORDED CREDITORS IN EACH CLASS IN THE EVENT OF A "CRAM DOWN" WILL BE AS INDICATED HEREIN.  Any effort by the Debtors to confirm the Plan pursuant to the cram down method will likely involve complex litigation which, regardless of the outcome, may impose substantial additional administrative expenses on the Debtors' Estates. Such expenses would be paid ahead of any distribution to unsecured creditors.

## XIV.   VOTING ON THE PLAN AND ACCEPTANCE

In order for the Plan to be accepted under the Bankruptcy Code, the Plan has to be accepted by each class of Creditors and interest holders whose rights are impaired under the Plan. Each Class of Claims will be deemed to have accepted the Plan if it is accepted by Creditors or Interest holders holding at least two thirds in amount and more than one-half in number of the Allowed Claims or Interests of such Class of Claims that actually vote.  If all the requirements for confirmation of the Plan under the Bankruptcy Code are satisfied, except that the Plan is not accepted by each Class of Creditors, the Bankruptcy Court may confirm the Plan without acceptance of Creditors, under the cram down provisions of § 1129(b) described in Section XI above. Each Creditor who wishes to exercise the right to vote must do so by executing a Ballot and returning the same to counsel for the Debtors, Baker & Daniels, 300

North Meridian Street, Suite 2700, Indianapolis, Indiana 46204, Attention: Terry Hall, Esquire, within the time period prescribed by the Bankruptcy Court. An official Ballot will accompany the approved Disclosure Statement along with a notice of important dates for receipt of ballots and objecting to the Plan.

## XV.    RISK FACTORS

The Debtors' Plan, as with virtually any plan, contains certain risk factors. However, to the extent possible, the risk to unsecured creditors has been greatly reduced.

The Debtors may modify this Plan at any time prior to the Confirmation Date, but may not modify the Plan so that the Plan as modified fails to meet the requirements of §§ 1122 and 1123 of the Bankruptcy Code.

After the Confirmation Date or in the Confirmation Order, the Debtor, with the approval of the Bankruptcy Court, and subject to the restrictions set forth in § 1127 of the Bankruptcy Code, may remedy any defect or omission, or reconcile any inconsistencies in the Plan or amend the Plan in such a manner as may be necessary to carry out the purposes and effect of the Plan. The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if confirmation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall (a) constitute a waiver or release of any claims by or against the Debtors, or (b) prejudice in any manner the rights of the Debtors.

BDDB01 6851331v1

Dated: September 10, 2011        SUMMITT LOGISTICS & BROKERAGE, LLC

                By: Summitt Holdings, LLC, sole member

                By:/s/ David L. Summitt, managing member

SUMMITT TRUCKING, LLC

                By: Summitt Holdings, LLC, sole member

                By:/s/ David L. Summitt, managing member

TRACTOR LEASING, LLC

                By: Summitt Holdings, LLC, sole member

                By:/s/ David L. Summitt, managing member

TRAILER LEASING, LLC

                By: Summitt Holdings, LLC, sole member

                By:/s/ David L. Summitt, managing member

BAKER & DANIELS LLP

_____

James M. Carr (#3128-49)
Terry E. Hall (#22041-49)
Baker & Daniels LLP
300 North Meridian Street, Suite 2700
Indianapolis, Indiana  46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000

Attorneys for the Debtors